Eisenman *v.* Hornberger (et al., Appellant).

Argued January 8, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*H. Clay McCormick,* with him *Furst, McCormick, Lynn, Reader & Nichols,* for appellant.

*John C. Youngman, Sr.,* with him *Candor, Youngman, Gibson & Gault,* for appellees.

OPINION BY MR. JUSTICE EAGEN, April 22, 1970:

This is an appeal from the judgment entered below on the pleadings in an attachment execution proceeding. The issue is one of first impression in Pennsylvania, although courts in several other jurisdictions have ruled on the question presented.

The material facts are not in dispute.

On the night of February 4, 1960, Alton Raymond Hornberger, then seventeen years of age, and Frank Scarfo broke into the home of Mr. and Mrs. Eisenman and stole a quantity of liquor. The owners were out of town at the time. To minimize possible detection, the felons lit matches to find their way around the house, rather than turn on the lights. As each match burned down, it was dropped or thrown to the floor. A head of one of the matches lodged in between the cushion and overstuffing of a chair. When the felons departed from the premises, there was no sign of fire, but the match head which landed in the chair, as be-

fore related, ignited the material, which, after smoldering for hours, finally resulted in a fire which completely destroyed the house and personal property therein.

The Eisenmans instituted suit for damages against Hornberger, Scarfo, and three other juveniles who waited outside and served as lookouts during the burglary. A jury trial resulted in a verdict against all defendants and in favor of the plaintiffs in the amount of $70,375.99. Samuel Harrison, one of the defendants, was covered against liability by a homeowner's policy with a $25,000 policy limit. His insurer settled the claim against him for $24,000 and secured a release.

At the pertinent time, Alton Raymond Hornberger's father was also the named insured in a homeowner's policy issued by the Royal Insurance Company, LTD. (Royal). And it is undisputed that the son himself was equally an "insured" within the terms of the policy.[1]

The Eisenmans issued a writ of execution against Hornberger, which was returned Nulla Bona. Attachment execution proceedings then followed against Royal, which ultimately ended with the entry of judgment on the pleadings against Royal for $25,000[2] and interest. Royal appeals. We affirm.

Under the terms of the policy (Section II, Coverage E), Royal agreed "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . ." Property damage is defined in the policy as "injury to or destruction of property," and it is in no way limited to property of the Insured. There was an

---

[1] The policy provides in pertinent part: "The unqualified word 'Insured' includes (1) the Named insured and (2) if residents of his household, his spouse, the relatives of either, and any other person under the age of twenty-one in the care of an insured.

[2] This was the maximum amount of liability provided for in the insurance policy.

exclusion in the policy which provided that "Section II of this Policy does not Apply: . . . (c) under Coverages E and F, to . . . property damage caused intentionally by or at the direction of the Insured."

Royal's contentions on appeal are two-fold. It first alleges that the acts committed by Hornberger were intentional and therefore excluded from coverage under the policy. However, the question is not whether the dropping of the matches was an "intentional act," but rather whether the resulting property damage was "intentionally caused" by the insured. The insurance policy does not exclude damage resulting from intentional acts of the insured but only damage intentionally caused by him. There is no basis on which to conclude that the insured in this case intended to cause any property damage in dropping the matches as they burned down to the end of the stem.

As noted before, while there are no Pennsylvania cases dealing with such an exclusionary clause in a homeowner's policy, the vast majority of courts which have considered such a provision have reached the conclusion that before the insurer may validly disclaim liability, it must be shown that the insured intended by his act to produce the damage which did in fact occur. Annot., 2 A.L.R. 3d 1238 (1965). We subscribe to such a view. There is a very real distinction between intending an act and intending a result and the policy exclusion addresses itself quite clearly to the latter. Cf. *State Farm Mutual Automobile Insurance Co. v. Worthington*, 405 F. 2d 683 (8th Cir. 1968) [identical exclusionary clause]; *American Insurance Co. v. Saulnier*, 242 F. Supp. 257 (D.C. Conn. 1965) [identical policy provisions]; *City of Burns v. Northwestern Mutual Insurance Co.*, 248 Or. 364, 434 P. 2d 465 (1967) [virtually identical exclusionary clause]; *Connecticut Indemnity Co. v. Nestor*, 4 Mich. App. 578, 145 N.W. 2d 399 (1966) [identical policy provisions];

50

*Smith v. Moran,* 61 Ill. App. 2d 157, 209 N.E. 2d 18 (1965) [identical policy provisions].[3]

Royal's second allegation is that it would be against public policy to allow recovery on the insurance contract since the property damage occurred as a result of acts performed by the insured in the course of the commission of a crime. We are not so persuaded.

We note initially that the insurance contract itself does not contain a "violation of law" clause. Royal is thus placed in the position of asserting that we should rewrite the policy to provide for a contingency which it could have provided for itself. However, under the facts of this case, we are not confronted with any overriding public policy which would preclude recovery. There is no evidence whatsoever that the policy was procured *in contemplation* of the crime. Nor can the insurance policy be said to have *promoted* the unlawful act. Moreover, it seems equally implausible that denying coverage would serve as a crime *deterrent.* Finally, the insurance policy in no way saves the insured from the consequences of his criminal act. In the context of this case, the sanctions of the criminal law and the coverage of the insurance policy address themselves to quite separate and distinct actions on the part of the insured.

A helpful analogy may be drawn from such automobile liability insurance cases as *Sky v. Keystone Mutual Casualty Co.,* 150 Pa. Superior Ct. 613, 29 A. 2d 230 (1942); *Harleysville Mutual v. U.S.F. & G.,* 27 Pa. D. & C. 2d 544 (1961); *Sperling v. Great American Indemnity Co.,* 7 N.Y. 2d 442, 166 N.E. 2d 482 (1960), and *Blackwell v. National Fire Ins. Co. of Hartford,* 234 N.C. 559, 67 S.E. 2d 750 (1951).

---

[3] While we find it unnecessary to elaborate on the precise nature of Hornberger's acts, we do note that in all of the above cited cases the acts of the various insureds manifested a far greater degree of deliberateness—of purpose—than those present here.

The first three cases all involved an insured who became involved in an auto accident while driving a stolen vehicle. In all three cases, once it had been ascertained that the thief was truly an insured within the terms of his policy, the particular courts involved found that public policy did not prohibit recovery. "The insurer here has been called upon to indemnify Christine [the insured] against the consequences of her *negligence* in the *operation* of a motor vehicle, not against the *criminal* consequences stemming from her willful misappropriation of the vehicle. The manner in which she acquired the vehicle had nothing whatever to do with her liability for its negligent operation." *Sperling v. Great American Indemnity Co.,* supra at 451, 166 N.E. 2d at 487.

In *Blackwell v. National Fire Ins. Co. of Hartford,* supra, an insured was transporting intoxicating liquors in his car in violation of law and was endeavoring to escape arrest by pursuing police when his car was involved in a collision. The North Carolina Supreme Court held that in spite of the circumstances which preceded the accident, recovery should be allowed: "The insurance contract had no direct connection with the violation of law admitted, but was only collateral thereto." *Blackwell,* supra at 560, 67 S.E. 2d at 750.

In view of the fact that Royal could easily have provided for situations such as the one before us by including a "violation of law" clause in its policy, we are loath to insert such a clause for the greater protection of the insurer where we are not confronted with an overriding public policy which would so dictate.

Judgment affirmed.