WARD, Appellee,

v.

CUSTOM GLASS & FRAME, INC., et al., Appellants.

[Cite as *Ward v. Custom Glass & Frame, Inc.* (1995), 105 Ohio App.3d 131.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 67494.

Decided July 10, 1995.

*Spangenberg, Shibley, Traci & Liber* and *Peter H. Weinberger,* for appellee.

*Thompson, Hine & Flory, Christopher M. Bechhold, Jack F. Fuchs* and *Donald P. Screen,* for appellants.

HARPER, Judge.

Appellants, Commercial Insurance Companies ("Commercial") and American Employers' Insurance Company ("American"), appeal from the summary judgment granted for appellee, Barry Ward, by the Cuyahoga County Court of Common Pleas. For the reasons set forth below, we affirm.

I

Custom Glass & Frame, Inc. ("Custom")[1] is insured under a policy issued by American. Appellee is an employee of Custom. Appellee was injured while using a bench saw from which a guard had been removed. Appellee filed an action in intentional tort against Custom. American denied coverage but chose to defend Custom under the policy's reservation of rights provision.

Appellee's claim was sent to arbitration. He was awarded $13,200 in compensatory damages.

American appealed the award *de novo* to the court of common pleas. At all times American took the position that Custom was not covered for the injury and would be solely liable for damages.

Custom's counsel wrote a letter to American demanding that it accept coverage of appellee's claim or withdraw from the appeal. American refused to provide coverage and subsequently withdrew its notice of appeal. Custom then settled with appellee for the arbitrated amount of $13,200, which was reduced to judgment.

Appellee filed a supplementary complaint against appellants seeking recovery for the amount of the judgment pursuant to R.C. 3929.05.

Cross-motions for summary judgment were filed with appellants claiming that the policy did not cover intentional torts and that Custom also breached its contract of coverage when it settled with appellee over the objection of appellants. Appellants argued in their summary judgment motion that Custom had forfeited its rights to indemnification by agreeing to the consent judgment.

The trial court overruled appellants' argument. The court found that Custom had not forfeited its right to indemnification. The court then granted appellee's motion for summary judgment, holding appellants liable for the damages.

II

Appellants assign the following errors for review:

---

1. Custom is not a party to this appeal.

"I. Custom's breach of the policy's cooperation and 'no action' clauses relieves appellants of any obligation to indemnify the insured or satisfy the judgment.

"II. Appellants' policy excludes coverage for appellee's claim.

"A. Only 'accidents' are covered by appellants' stop-gap endorsement.

"B. Appellants' endorsement specifically excludes coverage for employer intentional torts."

■ Appellants in their first assignment of error contend that Custom's agreement to settle with the injured plaintiff, Barry Ward, constituted a breach of Custom's duty to cooperate. Appellants contend that such breach relieved them of any and all liabilities arising from the policy coverage.

The conditions section of the policy provides in pertinent part as follows:

"The insured shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident."

In the "No Action" clause, the policy provides as follows:

"No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the Company."

■ The general rule remains that a failure of the insured to cooperate with the defense of an action against him may constitute a breach of contract which in turn may relieve the insurance company of liability on the policy. *Luntz v. Stern* (1939), 135 Ohio St. 225, 14 O.O. 62, 20 N.E.2d 241; see, also, *State Farm Mut. Auto. Ins. Co. v. Holcomb* (1983), 9 Ohio App.3d 79, 9 OBR 99, 458 N.E.2d 441; *Travelers Indemn. Co. v. Cochrane* (1951), 155 Ohio St. 305, 44 O.O. 302, 98 N.E.2d 840; *Conold v. Stern* (1941), 138 Ohio St. 352, 20 O.O. 449, 35 N.E.2d 133. But this general rule is neither carved in stone nor is it a per se rule. Thus, whether an insured by its actions or omissions breached the cooperation clause of its policy is a question that must be determined by examining the totality of the circumstances surrounding each case. See *Gabor v. State Farm Mut. Auto Ins. Co.* (1990), 66 Ohio App.3d 141, 144, 583 N.E.2d 1041, 1043; *Northedge Laborato-*

*ry, Inc. v. Cincinnati Ins. Co.* (Mar. 3, 1987), Montgomery App. No. CA 10090, unreported, 1987 WL 7513. As stated by the Ohio Supreme Court in *Luntz v. Stern, supra:*

"The assured cannot arbitrarily or unreasonably decline to assist in making a fair and legitimate defense, or refuse to permit any defense to be made in his name. By so doing, a material condition of his policy is violated and his rights under the policy are forfeited notwithstanding the insurance company could otherwise have protected itself." *Id.,* 135 Ohio St. at 232, 14 O.O. at 65, 20 N.E.2d at 244.

█ The general rule is that a violation of any provision in an insurance policy is best determined by the fact finder. *Costa v. Cox* (1958), 168 Ohio St. 379, 7 O.O.2d 147, 155 N.E.2d 54, paragraph two of the syllabus; see, also, *Gabor, supra.* However, when the facts are undisputed, a court may decide the issue involving the cooperation clause as a matter of law. *Luntz, supra,* 135 Ohio St. at 237, 14 O.O. at 67–68, 20 N.E.2d at 246–247; see, also, *Travelers Indemn. Co. v. Cochrane, supra; Gabor, supra,* 66 Ohio App.3d at 144, 583 N.E.2d at 1043.

In the instant case, the undisputed facts are as follows: A complaint for intentional tort was filed against Custom by appellee. American, under the reservation clause of its policy with Custom, agreed to defend the lawsuit. At all times, American maintained that its policy did not cover the injury sustained by appellee, a notice implied and actual that it would not pay if Custom was found liable.[2] The case went to arbitration. The arbitration was in favor of appellee and Custom was ordered to pay $13,200 in compensatory damages. American filed a notice of appeal *de novo* challenging the arbitration award.

While the appeal was pending, American became aware that Custom did not wish to continue the appeal. Thus, on April 18, 1991, Ellen Twining, a senior adjuster for appellant Commercial, sent a letter to Gary Okin, Custom's corporate counsel, stating:

"Dear Mr. Okin:

"It is our understanding that Custom Glass, who is our insured, is in the process of withdrawing the appeal of the arbitration award in connection to the above case. As I have indicated to you previously in writing, Commercial Union Insurance Company will not agree to this.

"Under the terms and conditions of the insurance policy with Commercial Union Insurance Company there is a cooperation clause which clearly states that Custom Glass must cooperate with Commercial Union in the defense and

---

**2.** This is found in the parties' stipulation.

investigation of any accident. If Custom Glass proceeds to withdraw the appeal of the arbitrational award, Commercial Union Insurance company will consider this act as a breach of the insurance contract and will deny all coverage for this lawsuit. We demand to know within five (5) working days if there are any agreements between plaintiff's counsel and Custom Glass. We continue to defend the insured in this lawsuit under the same terms and conditions as stated in the past. Please see to it that Mr. Martin Litt of Custom Glass receives a copy of this letter.

"Very truly yours,

"Ellen Twining,

"Senior Adjuster"

On May 21, 1991, Okin sent the following letter to Thomas Kaiser, counsel for appellants:

"Dear Mr. Kaiser:

"As corporate counsel for Custom Glass and Frame, Inc., the named defendant in the captioned matter, I am hereby instructing you to immediately withdraw the Notice of Appeal de Novo filed therein, unless Commercial Union Insurance accepts coverage on this claim and notifies me of such acceptance in writing.

"As we have previously discussed, this action is being taken based on an agreement reached with the plaintiff's counsel to the effect that there will be no execution on this judgment against my client, its officers or representatives in the event the appeal is withdrawn.

"I felt it necessary to have my client enter into this Agreement inasmuch as Commercial Union Insurance has taken the position that the insurance policy under which Custom Glass has been provided a defense does not provide coverage for this "Blankenship" claim. Thus, payment of whatever judgment might ultimately be rendered against Custom Glass in any retrial of this case would be my client's responsibility from the position of its own insurer.

"Based upon my understanding of the current status of the law, Commercial Union's position is untenable, constitutes bad faith, and places my client in financial jeopardy which is relieved by the agreement entered into with the Plaintiff.

"If I am in error with respect to Commercial Union's position regarding coverage, then please so advise me in writing on an immediate basis. Otherwise, I must instruct you to promptly withdraw the Appeal.

"Thank you for your courtesy herein.

"Very truly yours,

"/s/

"Gary S. Okin"

The stipulation agreement and Okin's letter, which was not responded to, clearly show that appellants did not intend to pay for appellee's injuries.

■ The purpose for paying premiums of insurance coverage is to buy peace of mind so that when accidents occur, the insured can trust that his insurance company will not renege on its agreement. When an insurance company refuses to provide coverage and at the same time seeks to maintain control of the same litigation, it disclaims liability to indemnify and creates a frustration of purpose. Such conduct would compel a person of reasonable faculties to cut his costs and settle a lawsuit to avoid the possibility of a higher judgment. See *Sanderson v. Ohio Edison Co.* (1994), 69 Ohio St.3d 582, 586, 635 N.E.2d 19, 23–24. An insurance company which believes and maintains a position that coverage does not exist must make a clean break from the case and should not subject the insured to a guessing game or by its conduct cause the insured to incur more expenses than necessary. After all, whether the insurer can or cannot pay under the policy is not really affected by its decision not to defend the case. See *Aetna Cas. & Sur. Co. v. Buckeye Union Cas. Co.* (1952), 157 Ohio St. 385, 47 O.O. 270, 105 N.E.2d 568; see, also, *Sanderson, supra.*

In the instant case, appellants' attempt to "have their cake and eat it, too" put Custom in an untenable position. Appellants, being in full control of the case, would like the case to go on. If they win, Custom is vindicated and neither appellants nor Custom pays any liability. However, if they lose, they still pay no liability because they have a defense based on the reservation of rights clause and Custom pays, only this time, the liability might be more than what Custom would have paid had it settled out of court.

After reviewing the facts and circumstances of this case, we hold that Custom's decision to settle without the consent of appellants was not arbitrary or unreasonable and its rights under the policy were not forfeited by its action to settle. See *Luntz, supra;* see, also, *Great Am. Indemn. Co. v. Corpus Christi* (Tex.Civ.App. 1945), 192 S.W.2d 917. It acted as any reasonable prudent person would have under the circumstances. Appellants, therefore, suffered no material prejudice that they did not bring upon themselves. See *Costa v. Cox, supra.* We have considered all the cases cited by appellants and found them not controlling beyond the extent stated in this opinion.

Since appellants' first assignment of error has no merit, it is accordingly overruled.

## III

Appellants, in their second assignment of error, argue that they are entitled to summary judgment because under the policy of coverage "only 'Accidents' are covered by appellants' Stop Gap Endorsement." Appellants argue that appellee filed an action in intentional tort, which is specifically excluded from coverage pursuant to the policy with Custom.

The pertinent portions of the policy provide as follows:

"The Company [American Employers Insurance Company] will pay on behalf of the insured [Sana Company/Custom Glass and Frame] all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent and may make such investigation and settlement of any claim or suit as it seems expedient but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

The Stop Gap Endorsement provides in relevant part that American Employers Insurance Company agrees:

"to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury by accident or disease, including death at any time resulting therefrom, sustained in the United States of America, its territories or possessions, or in Canada, by any employee of the insured described in the agreements (paragraph 1) of this endorsement, arising out of and in the course of his or her employment by the insured."

The Stop Gap Endorsement also contains various exclusions including the following:

"Exclusions—Such insurance as is afforded by this endorsement does not apply:

"(a) to bodily injury or death resulting therefrom caused intentionally by or at the direction of the insured."

The Ohio Supreme Court ruled on the proper application of a provision in a contract of insurance excluding coverage for injuries expected or intended by an insured employer in *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 175, 551 N.E.2d 962, 964. The court began with a brief analysis of the difference between a "direct intent" to injure and an injury that is substantially

certain to occur even if the actor does not desire the result. The latter of these frequently applies in an employer/employee adjudications. The court stated:

"We begin our discussion with an analysis of the nature of employer intentional torts. In *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraphs five and six of the syllabus, we adopted, in effect, the definition of an 'intentional tort' contained in 1 Restatement of the Law 2d, Torts (1965), as the law of Ohio. Under this standard, an intentional tort occurs when ' * * * the actor desires to cause consequences of his act, or * * * he believes that the consequences are substantially certain to result from it.' 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A. This definition encompasses two different levels of intent. The first level, which we will refer to as 'direct intent,' is where the actor does something which brings about the exact result desired. In the second, the actor does something which he believes is substantially certain to cause a particular result, even if the actor does not desire that result.

"It appears that most employer intentional torts, including the claim pled in the instant case, fall into the latter category. *Where the employer's alleged tortious actions were not taken with deliberate intent to injure the employee, and where the damages sought are to compensate for injury rather than to punish wrongdoing, the public policy argument for depriving the employer of insurance protection is not compelling.*

"All liability insurance protects the tortfeasor from economic loss resulting from legal liability. Prosser & Keeton, The Law of Torts (5 Ed.1984) 585, Section 82 ('Prosser'); Keeton & Widiss, Insurance Law (1988) 517, Section 5.4(c)(5) ('Keeton'). At one time, liability insurance was attacked on public policy grounds 'as an encouragement to antisocial conduct and a relaxation of vigilance toward the rights of others, by relieving the actual wrongdoer of liability. * * *' Prosser, *supra,* at 585, Section 82. As tort law evolved toward an emphasis on victim compensation, *id.* at 7, Section 2, and 'it became apparent that no dire consequences in fact resulted,' *id.* at 586, Section 82, public policy came to favor liability insurance for negligent acts as a means of assuring that innocent persons are made whole. This policy of assuring victim compensation has been extended to 'wanton' and 'reckless' torts. *Keeton, supra,* at 524–525, Section 5.4(d)(3).

"It is often said that public policy prohibits liability insurance for intentional torts. *Keeton, supra,* at 519, Section 5.4(d)(1). This statement is based on 'the assumption that such conduct would be encouraged if insurance were available to shift the financial cost of the loss from the wrongdoer to his insurer. * * *' Farbstein & Stillman, Insurance for the Commission of Intentional Torts (1969), 20 Hastings L.J. 1219, 1245–1246. However, this blanket prohibition 'makes no distinctions as to the various forms of intentional wrongdoing and does not admit the possibility that some torts might not be particularly encouraged if insurance

were available for them.' *Id.* at 1251. *The better view is to prohibit insurance only for those intentional torts where 'the fact of insurance coverage can be related in some substantial way to the commission of wrongful acts of that* character. \* \* \*' *Isenhart v. General Cas. Co.* (1962), 233 Ore. 49, 52–53, 377 P.2d 26, 28; Farbstein & Stillman, *supra,* at 1251–1253. In the case of a 'direct intent' tort, the presence of insurance would encourage those who deliberately harm another. *In torts where intent is inferred from 'substantial certainty' of injury, the presence of insurance has less effect on the tortfeasor's actions because it was not the tortfeasor's purpose to cause the harm for which liability is imposed.* See *Indiana Lumbermens Mut. Ins. Co. v. Brandum* (Ind.App. 1981), 419 N.E.2d 246, 248. In the latter situation, the policy of assuring victim compensation should prevail." (Emphasis added.) *Harasyn,* 49 Ohio St.3d at 175–176, 551 N.E.2d at 964–965.

The *Harasyn* court concluded:

"Public policy does not prohibit an employer from securing insurance against compensatory damages sought by an employee in tort where the employer's tortious act was one performed with the knowledge that injury was substantially certain to occur."

In *Harasyn,* the policy at issue provided, as in the case *sub judice,* for coverage for "damages because of bodily injury by accident or disease, including death at any time resulting therefrom, sustained by any employee of the insured arising out of and in the course of his employment by the insured. \* \* \*" The policy in *Harasyn* excluded occurrences "which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The *Harasyn* court ruled that coverage applied in spite of the provision in the policy which disallowed "expected or intended injury from the standpoint of the insured." The logical explanation of the *Harasyn* court interpretation is that where an employer's policy of coverage purports to cover an injury to an employee arising out of and in the course of his or her employment, an intentional tort that is inferred from "substantial certainty" of injury and not as a deliberate intent to harm an employee is covered by the policy.

"The better view is to prohibit insurance only for those intentional torts where 'the fact of insurance coverage can be related in some substantial way to the commission of wrongful acts of that character. \* \* \*' In the case of a 'direct intent' tort, the presence of insurance would encourage those who deliberately harm another. In torts where intent is inferred from 'substantial certainty' of injury, the presence of insurance has less effect on the tortfeasor's actions because it was not the tortfeasor's purpose to cause the harm for which liability is imposed. In the latter situation, the policy of assuring victim compensation should prevail." *Id.,* 49 Ohio St.3d at 176, 551 N.E.2d at 965.

In applying the *Harasyn* logic to the case *sub judice*, we hold that appellants' policy of coverage is applicable to appellee's injury, which was sustained during the course of his employment. It is our opinion that the supplemental endorsement for which Custom paid all the premiums would be of no meaning if Custom is denied coverage because of the exclusion.

Again, in *Physicians Ins. Co. v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906, a case decided after *Harasyn*, the Ohio Supreme Court revisited a policy exclusion based on the insured's intentional tort. In *Swanson* the policies in question provided in pertinent part as follows:

"Part I, Exclusions to Part G and Part H

"1. Part G, Personal Liability Coverage and Part H, Medical Payments to Others does [*sic*] not apply to bodily injury or property damage:

"a) which is expected or intended by the insured[.]

"Part IV—What is Not Covered—Exclusions

" * * *

"8. We will not cover Personal Injury or Property Damage caused intentionally."

In *Swanson*, the insured pointed a BB gun at another individual who was lying on a picnic table and fired at him. He was struck in the eye and subsequently lost his right eye. The insurer filed a declaratory judgment action arguing that the injury was not covered by its policy because it was intentional. The court wrote:

"While interpreting an exclusion for 'property damage caused intentionally by or at the direction of the insured,' the Supreme Court of Pennsylvania stated that 'the vast majority of courts which have considered such a provision have reached the conclusion that before the insurer may disclaim liability, it must be shown that the insured intended by his act to produce the damage which did in fact occur. Annot., 2 A.L.R.3d 1238 (1965). We subscribe to such a view. There is a very real distinction between intending an act and intending a result and the policy exclusion addresses itself quite clearly to the latter.' *Eisenman v. Hornberger* (1970), 438 Pa. 46, 49, 264 A.2d 673, 674." *Swanson*, 58 Ohio St.3d at 192, 569 N.E.2d at 909.

The court continued:

"More recently, a federal court of appeals interpreting Florida law has stated that ' * * * we believe the standard enunciated by the lower courts of Florida adheres to the majority rule with respect to "intentional injury" exclusions. Under the majority rule the exclusion applies if the insured intended to do the particular act, and intended to do some harm * * *. * * * On the other hand,

an "intentional injury" exclusion will not apply if the insured intentionally does an act, but has no intent to commit harm, even if the act involves the foreseeable consequences of great harm or even amounts to gross or culpable negligence.' *Allstate Ins. Co. v. Steinemer* (C.A.11, 1984), 723 F.2d 873, 875. The court went on to hold that the evidence created a genuine issue of fact as to whether the insured intended harm when he fired a BB gun at his friend.

"Likewise, in *Farmers Ins. Group v. Sessions* (1980), 100 Idaho 914, 607 P.2d 422, the court held that for an exclusion for injuries intentionally caused to operate, the insurance company must demonstrate that the insured acted ' * * * for the purpose of causing injury in the person or property in which it resulted.' *Id.* at 918, 607 P.2d at 426. In so holding, the court rejected the insurer's argument that the policy requires nothing more than an intentional act for the exclusion to operate." *Swanson,* 58 Ohio St.3d at 192–193, 569 N.E.2d at 909.

The *Swanson* court in conclusion stated:

"From the above case law, it can be seen that other jurisdictions require that in order for an exclusion of this nature to apply, an insurer must demonstrate not only that the insured intended the act, but also that he intended to cause harm or injury. The rationale for this rule of law is twofold. First, the plain language of the policy is in terms of an intentional or expected *injury,* not an intentional or expected *act.* Were we to allow the argument that only an intentional act is required, we would in effect be rewriting the policy. Second, as the courts above have noted, many injuries result from intentional acts, although the injuries themselves are wholly unintentional. See *State Farm Mut. Ins. Co. v. Worthington, supra* [ (C.A.8, 1968), 405 F.2d 683], and *Farmers Ins. Group v. Sessions, supra.*

"In the case at bar, the trial court found that while the insured intentionally fired a BB gun in the direction of the injured person, the injury itself was neither intended nor substantially certain to occur. Rather, the finder of fact conclusively found that the injury was accidental. Based on our interpretation of [*Preferred Risk Ins. Co. v.*] *Gill, supra* [ (1987), 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118], and the persuasive reasoning of the courts in other jurisdictions, we find the court of appeals erred by requiring that only the act of the insured need be shown to have been intentional.

"*Therefore, we hold that in order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended. It is not sufficient to show merely that the act was intentional.*" (Emphasis added.) *Swanson,* 58 Ohio St.3d at 193, 569 N.E.2d at 910–911.

After carefully reviewing the record in light of the *Harasyn* and *Swanson* decisions, we conclude that appellants did not demonstrate, nor did the record show affirmatively, that Custom intended to cut off appellee's fingers by placing a bench saw in operation.

Although Custom's act of placing the bench saw was intentional, and the injury arguably foreseeable, pursuant to *Swanson* an "intentional injury" exclusion in the instant case is inapplicable because appellants have failed to show that Custom intended to cause harm to appellee.

## IV

Appellants cite a decision from the Tenth District Court of Appeals, *Royal Paper Stock Co., Inc. v. Meridian Ins. Co.* (1994), 94 Ohio App.3d 327, 640 N.E.2d 886, which states that:

"Under the limited facts of this case, we hold that it is not necessary for appellee to prove appellant intentionally caused the injuries. The endorsement and underlying tort complaint constitute evidence clearly entitling appellee to judgment as a matter of law: therefore, appellee met its burden under *Wing* [*v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095] and *Baughn* [*v. Reynoldsburg* (1992), 78 Ohio App.3d 561, 605 N.E.2d 478], *supra.* Regardless of the test applied (whether 'scope of the allegations' under *Monsler* [*v. Cincinnati Cas. Co.*], *supra* [ (1991), 74 Ohio App.3d 321, 598 N.E.2d 1203], and *Willoughby Hills v. Cincinnati Ins. Co.* [1984], 9 Ohio St.3d 177, 9 OBR 463, 459 N.E.2d 555, or the 'true facts' test under *Gill, supra*)," the insured would not be covered. *Royal Paper,* 94 Ohio App.3d at 330–331, 640 N.E.2d at 889.

The court concluded:

"We are mindful of the Ohio Supreme Court decision in *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 551 N.E.2d 962, wherein insurance coverage of employers' tortious acts performed with knowledge that injury was substantially certain to occur was held to be acceptable and not contrary to public policy. *Harasyn,* however, was premised on the legislative enactment of R.C. 4121.80, which created a statewide fund to pay claims arising out of employer intentional torts. The Supreme Court noted that this enactment was an expression by the public's elected officials that such insurance is not against public policy. R.C. 4121.80, however, was repealed in 1992; therefore, insurance coverage of employer intentional torts is truly contrary to public policy." *Royal Paper,* 94 Ohio App.3d at 333, 640 N.E.2d at 890.

We disagree with our sister court for two reasons. First, for an exclusion based on intentional tort to apply, it is necessary pursuant to *Swanson, supra,* for the insurer to prove that the insured intentionally caused the injury. The weight

of evidence necessary to prove intentional tort may be higher for exclusion than it is for the injured to show the insured's culpability. The *Swanson* court held:

"Thus, our holding that there was no coverage in *Gill* was premised on the facts that the insured *intended to cause the injury* of another person, and that this intent was conclusively established by the insured's plea of guilty to aggravated murder. Stated otherwise, our decision was based on a finding that the insured intended to cause an injury, *i.e.,* the death of an eleven-year-old girl. *While Gill used language regarding the intentional act or conduct of the insured, Gill actually stands for the proposition that it is the resultant injury which must be intended for the exclusion to apply to deny coverage.*" (Emphasis added.) *Swanson, supra,* 58 Ohio St.3d at 191, 569 N.E.2d at 909.

In conclusion, the *Swanson* court held:

"Therefore, we hold that in order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended. It is not sufficient to show merely that the act was intentional." *Id.* at 193, 569 N.E.2d at 910.

Also, any residual doubt as to what the majority meant in *Swanson,* is dispelled in the dissent by Justice Wright when he wrote:

"I must respectfully but vigorously dissent from today's majority opinion, *which holds that an insurer cannot deny coverage to its insured who commits an intentional tort intended or expected to cause injury, yet who merely underestimates the precise extent of harm that results from the tortfeasor's intentional conduct.* It is clear to me that this holding misconstrues the plain language of the pertinent insurance policies in this case. It is also clear that this holding flies in the face of long-stated public policy which precludes insuring against intentional torts." (Emphasis added.) *Id.* at 194, 569 N.E.2d at 911.

Second, the *Harasyn* court's decision, contrary to the pronouncement by the *Royal Paper* court, was not premised on R.C. 4121.80. The mention of R.C. 4121.80 by the *Swanson* court was mere *obiter dicta.* The court's reasoning was based on its analysis of the distinguishing factors that make up an intentional tort.

Accordingly, we overrule appellants' assignments of error, and affirm the trial court.

*Judgment affirmed.*

DYKE and NAHRA, JJ., concur in judgment only.