MINNESOTA FIRE AND CASUALTY
COMPANY, Appellant,

v.

Michael GREENFIELD,
et al. Appellee.

Superior Court of Pennsylvania.

Argued Feb. 13, 2002.
Filed Aug. 9, 2002.

William T. Salzer, Philadelphia, for appellant.

Mark K. Emery, Mechanicsburg, for appellee.

Before: ORIE MELVIN, KLEIN and OLSZEWSKI, JJ.

KLEIN, J.

¶ 1 Appellant Minnesota Fire and Casualty Company ("Minnesota"), in this declaratory judgment action, appeals the trial court's March 14, 2001, order declaring that Minnesota owed a duty to defend and potentially indemnify Greenfield. We reverse.

¶ 2 Michael Greenfield voluntarily and intentionally provided heroin, in a bag labeled "suicide", to Angela Smith. Angela Smith voluntarily and intentionally used

that heroin and died as a result. Angela Smith's parents, Sharon L. Smith and Arlin C. Smith, individually and as administrators of the estate of Angela C. Smith ("Smith"), filed a wrongful death and survival action against Greenfield, alleging negligence.

¶3 Minnesota had issued a homeowner's policy covering Greenfield for negligence. Without disputing any liability on the part of Greenfield, Minnesota argues that Smith's death was a result of an intentional act, and is therefore excluded from coverage under its policy.

¶4 We believe that an intent to cause injury existed as a matter of law due to the nature of Greenfield's conduct of providing Angela Smith with what tragically, and all too predictably, proved to be a fatal dose of heroin. Minnesota's policy issued to Greenfield excluded intentionally caused injuries from its coverage.

¶5 Our Court adopted the idea of inferred intent in child abuse cases in *Aetna Casualty and Surety Company v. Roe*, 437 Pa.Super. 414, 650 A.2d 94 (1994). Inferred intent results when there is an intentional act on the part of the insured and it is inherent in that act that harm will occur. In child abuse cases, the actor's abuse will frequently cause long-term harm to the child. Therefore, although the offender may not intend to cause long-term harm to the child, since it is likely to occur, the act is considered intentional and there is no insurance coverage for policies that merely cover general negligence. Courts have noted that the criminalization of the act puts the offender on notice that harm may well occur.

¶6 Just as it is certain that frequently long-term harm will occur from abusing a child, it is certain that frequently harm will occur to the buyer if one sells heroin. Not only is it criminalized because of the great risk of harm, but in this day and age, everyone realizes the dangers of heroin use. It cannot be said that Greenfield should have been surprised when Angela Smith suffered an overdose and died. While not every sale of heroin results in an overdose and death, many do.

¶7 Therefore, we vacate the trial court's order declaring that Minnesota owed a duty to defend and potentially indemnify Greenfield and remand this matter for the entry of a declaration that Minnesota owes no such duty.

¶8 A full discussion follows.

¶9 It is undisputed that Greenfield sold heroin to the Smiths' daughter, Angela C. Smith, who then ingested the drug at his home over the course of several hours and fell unconscious and ultimately died. Greenfield was charged and pled guilty to one count of involuntary manslaughter, one count of delivery of a controlled substance, and one count of abuse of a corpse.

¶10 The Smiths allege, in their civil suit, that the death of their daughter was due to the "wrongful actions, neglect and negligence of Greenfield." Trial Court Opinion and Order, 3/14/01, at 4; Smith Complaint, 6/9/99, at ¶28. Both Smith and Minnesota, in the declaratory judgment action, sought summary judgment as to Minnesota's duty to defend and indemnify Greenfield in the underlying wrongful death and survival action. The trial court denied appellant's motion and held that under the provisions of its homeowner's policy, it had a duty to defend Greenfield. Trial Court Opinion, 3/14/01, at 11. This timely appeal followed.

¶11 Appellant raises four issues for our review:

1. Whether the lower court erred in holding that the public policy of the Commonwealth of Pennsylvania does not

bar insurance coverage for the insured's liability based on criminal acts.

2. Whether the lower court erred in holding that the allegations of wrongful death arising out of the insured's sale of heroin to the decedent constitute an "occurrence" as defined by the Minnesota Fire insurance policy.

3. Whether the lower court erred in failing to apply the "expected or intended" harm exclusion of the Minnesota Fire insurance policy.

4. Whether the trial court erred in failing to apply the "business pursuits" exclusion of the Minnesota Fire insurance policy.

¶ 12 Brief for Appellant at 3.

■■■ ¶ 13 Our review of a trial court's disposition of a declaratory judgment is governed by the following standard of review:

"Our standard of review in a declaratory judgment action is limited to determining whether the trial court clearly abused its discretion or committed an error of law." We may not substitute our judgment for that of the trial court if the court's determination is supported by the evidence.

*State Automobile Mutual Insurance Company v. Christie*, 2002 PA Super 192 (2002). (Citations admitted).

■■■ ¶ 14 Additionally,

[w]e will review the decision of the lower court as we would a decree in equity and set aside the factual conclusions of that court only where they are not supported by adequate evidence. The application of the law, however, is always subject to our review.

*White v. Keystone Insurance Company*, 775 A.2d 812 (Pa.Super.2001). (Citations omitted).

■■■ ¶ 15 "A[n] [insurance] carrier's duties to defend and indemnify an insured in a suit brought by a third party depend upon a determination of whether the third party's complaint triggers coverage." *Mutual Benefit Ins. Co. v. Haver*, 555 Pa. 534, 725 A.2d 743, 745 (1999). "[T]he particular cause of action that a complaint pleads is not determinative of whether coverage has been triggered. Instead it is necessary to look at the factual allegations contained in the complaint." *Id.* (citing *Scopel v. Donegal Mutual Ins. Co.*, 698 A.2d 602 (Pa.Super.1997); *Aetna Casualty and Surety Co. v. Roe*, 437 Pa.Super. 414, 650 A.2d 94, 98 (1994)).

■■■ ¶ 16 The Smiths claim the death of their daughter was not intended, and was therefore, the result of a negligent act. An intentional act is defined as one where the consequences of the action are substantially certain. *Stidham v. Millvale Sportsmen's Club*, 421 Pa.Super. 548, 618 A.2d 945 (1992).

¶ 17 As noted, the notion of inferred intent is accepted in Pennsylvania. Our Court recognized the principle of inferred intent in *Aetna Casualty and Surety Company v. Roe*, 437 Pa.Super. 414, 650 A.2d 94 (1994). In *Aetna*, we adopted the reasoning employed by the United States Court of Appeals for the Third Circuit in its decision in *Wiley v. State Farm*, 995 F.2d 457 (3d Cir.1993) The basic concept of inferred intent is familiar to the law. The intent of an actor can be inferred from the nature of the act.[1] Our Court has commented:

---

1. In criminal law, the concept is often seen in homicide cases, where intent may be properly inferred from the facts and circumstances of the crime. It seems somewhat unbalanced to allow such an inference where the defendant may pay with his life, but to refuse such an inference in a civil dispute.

Recently, the Third Circuit Court of Appeals stated that in certain cases a court can infer an actor's intent as a matter of law from the nature and character of his or her acts. In its thorough review of current Pennsylvania law on the question of intent as well as a survey of the analyses applied in other jurisdictions in child abuse cases, the Court in *Wiley* noted that the inferred intent to harm is an irrebuttable presumption. The criminalization of child abuse additionally serves to place the insured on notice that the societal harm from such conduct is inseparable from its performance.

*Id* at 102. (citations omitted).

¶ 18 The logic and rationale behind the adoption of the inferred intent rule to child abuse cases seems equally applicable here.

■ ¶ 19 There can be no question that the abuse of a child produces a terrible harm. As a matter of law this harm is deemed to have been caused intentionally regardless of any claim by a defendant of lack of intent or even the inability to form the intent.

[The presumption of harm] offers the better rule because in exceptional cases such as sexual child abuse, where the insured's conduct is both intentional and of such a nature and character that harm inheres in it, that conduct affords a sufficiently clear demonstration of intent to harm subsuming any need for a separate inquiry into capacity. Once it is determined, strictly by examining the nature and character of the act in question, that it is appropriate to apply the inferred intent rule, then the actor's actual subjective intent becomes irrelevant.

*Wiley* at 467.

¶ 20 It is true that Smith's complaint clearly sounds against Greenfield in negligence. *See Fennell v. Nationwide Mutual*

*Fire Ins. Co.*, 412 Pa.Super. 534, 603 A.2d 1064 (1992). Appellant's homeowner's policy provides Greenfield with coverage from claims that are for damages because of "bodily injury or property damage caused by an occurrence to which this coverage applies." *Minnesota Fire and Casualty Home Plus Policy*, August, 1990, § 11, Coverage E, at 10. The policy defines occurrence as "an accident, including exposure to conditions, which result, during the policy period, in a.) bodily injury; or b.) property damage." *Id.* at 1. The policy defines bodily injury as "sickness or disease, including required care, loss of services and death ..." *Id.* The policy specifically excludes coverage for claims based on bodily injury "which is expected or intended by the insured." *Id.*

¶ 21 While Greenfield may not have *intended* that Angela Smith die, the risk of adverse effects from taking heroin is not unexpected, be those adverse effects sickness or even death. Under the policy language, we find that Greenfield's conduct in supplying her with heroin was intentional. Her death may not have been intentional, but, because of the known risks, an adverse reaction is an expected occurrence and the situation should not occur because of the degree of the adverse reaction, even when it results in death. It would be an irrational result if Minnesota would be responsible for death but not illness and hospital bills.

¶ 22 Because of the great dangers associated with heroin use, we disagree with the trial judge when he says, "[w]hile the complaint avers an intentional act by Greenfield of supplying heroin to Angela Smith, there are no averments that allege or reasonably infer that Greenfield expected or intended to cause her death." Trial Court Opinion, 3/14/01, at 5.

¶ 23 We believe that our Supreme Court's disposition in *Benefit Insurance*

*Co. v. Haver*, 555 Pa. 534, 725 A.2d 743 (1999) supports this principle. In *Haver*, a family sued a pharmacist for injuries suffered from his illegal distribution of medications. *Id.* at 745. The pharmacist sought indemnification from his professional insurance carrier. *Id.* His insurance carrier moved for a declaratory judgment relieving it from any duty to provide coverage. *Id.* Our Supreme Court held that the insurance company did not have a duty to defend or indemnify because the policy specifically excluded coverage for bodily injuries, which resulted from "knowing endangerment" by the pharmacist. *Id.* at 746.

¶ 24 Just as in *Haver*, the policy excluded coverage when the pharmacist "knowingly endangered" a life, any seller of heroin knows that his supplying of heroin "knowingly endangers" a life. While Greenfield may not have known exactly what reaction Angela would have to the heroin, an overdose and death was one of the possibilities. Therefore, the intent should be inferred.

¶ 25 Smith relies largely upon the logic of *Eisenman v. Hornberger*, 438 Pa. 46, 264 A.2d 673 (1970) in reaching its conclusion. *Eisenman* can be factually distinguished from the case at hand.

¶ 26 In *Eisenman*, a central fact was that the intentional act involved, burglary, was distinguishable from the negligent act, the dropping of a lit match which ultimately led to the house fire. There is nothing inherent in the act of burglary that includes the burning of a home. In *Eisenman*, therefore, no intent to harm may be inferred from the nature and character of the burglary. While the complained of action took place concurrently with an illegal act, the two actions were separable.

Thus, it could not be said there was any substantial certainty that the intentional act, burglary, would produce the wrong complained of, a fire. Here, the action and the evil—the sale and use of heroin and the death of the user—are part and parcel.

¶ 27 Heroin is a Schedule I controlled substance.[2] The legislature has stated, in making this determination:

(1) Schedule I—In determining that a substance comes within this schedule, the secretary shall find: a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision.

¶ 28 The legislature and the Secretary of Health of the Commonwealth of Pennsylvania have already determined that heroin has a high potential for abuse, has no accepted medical use within the United States, and, most importantly to the issue before us, is unsafe for use even under medical supervision.

¶ 29 The sale and possession (for use or delivery) of heroin are illegal.[3] It is not illegal for some nebulous reason, but illegal because of the inherent harm caused by heroin. This represents not only the harm caused to society in terms of costs and quality of life, but the real and devastating harm done to the user. The knowledge of this harm is not in the sole province of the medical profession. It is not esoteric. The dangers of heroin are legendary and known on a widespread basis. The knowledge of the dangers of heroin, including the all too real possibility of death, is chargeable to all. Millions upon millions of dollars a year are spent by various governmental and private agencies to prevent, treat, educate and punish the purveyors and users of illegal drugs in

**2.** 35 P.S. § 708–104(1)(ii)10.

**3.** 18 Pa.C.S. § 7508 and 35 P.S. § 708–113(a)(30).

general and heroin in particular. It is inconceivable that Smith and Greenfield were somehow unaware of the hazards associated with the use of heroin.

¶ 30 A sampling of case law from other jurisdictions, where courts denied insurance coverage for the heroin users or sellers, helps demonstrate the recognition of the inherent evils of heroin.

> Heroin is a dangerous drug. It is not prescribed by physicians and is not available through medical channels or otherwise, lawfully, in the United States.... It is one of the most powerful of narcotics. It is three times as powerful as morphine in its narcoting power ... [the] insured intentionally injected himself with heroin, a drug considered by physicians to be dangerous when used in the human body, and in fact a poison only obtainable in the black market.

*Republic National Life Insurance Company v. Mae Jannette Hamilton*, 373 S.W.2d 275, 278 (Tex.Civ.App.1963).

> Dr. Breineceker further notes that narcotics users were well aware of the substantial risk in the self-administration of heroin.... The possibility that the decedent may have been unaware of the risk in combining drugs becomes irrelevant when one of the drugs used, heroin, by itself carries with it a well known and substantial risk ... here, with the use of an illegal drug without medical authorization or supervision, a drug with a well known potential for injury, we are hard pressed to say that a great amount of risk was not assumed, or was unforeseeable.

*Sonya Gordon v. Metropolitan Life Insurance Company*, 256 Md. 320, 260 A.2d 338—339, 340 (1970).

> Regrettably, in today's society with the number of people who use heroin, under the circumstances which they use it (i.e. dirty needles, dirty places and dirty utensils) unable to adequately determine the strain of the substance used or appropriately measure the amount used, death is a common experience and the user may reasonably expect it. Death when it occurs can neither be 'unexpected,' 'unusual,' nor 'unforeseen'.... Indeed, the heroin user plays a form of "Russian roulette" substituting a needle for a pistol.

*Annie Jackson v. National Life & Accident Insurance Company*, 130 Ga.App. 208, 202 S.E.2d 711, 712 (1973).

¶ 31 In Pennsylvania, this Court has stated, regarding the enactment of the Drug Free School Zone Law: [4]

> It is our finding that the General Assembly's goal and purpose was to protect the children from the ravages and evils of the illegal drug trade that pervades our country.

*Commonwealth v. Campbell*, 758 A.2d 1231 (Pa.Super.2000).

¶ 32 Additionally, the use of heroin is admissible in a civil trial on the issue of damages because of the recognized impact of drug use on an injured party's life expectancy. *Kraus v. Taylor*, 710 A.2d 1142 (Pa.Super.1998).

¶ 33 Our Court has already recognized that the General Assembly has seen that the illegal drug trade produces "ravages and evils" which "pervades our country." Our legislature and Secretary of Health have determined that heroin has no accepted medical use and is unsafe for use even under medical supervision. The courts also recognize that illegal drug use has an impact on life expectancy so great that the introduction of evidence of its use

---

4. 18 Pa.C.S. § 6317.

outweighs any possible prejudice. While certainly not binding upon our Court, the commentary of other jurisdictions also realistically points out the dangers and harm inherent in the use of heroin and the knowledge of that harm. In light of the foregoing, the sale of heroin more than meets the special criteria for the imposition of inferred intent. Surely, the action and the evil of the sale and use of heroin are inseparable, and the intent to cause harm determinable as a matter of law.

¶ 34 Further, the knowledge of the dangers of this drug are so universal, the ravages and evils so real, that the intent to cause harm is apparent. The results of this particular transaction, while unfortunate, were indeed foreseeable, expected and usual and, therefore, substantially certain.

¶ 35 The Georgia Appellate Court's comparison, in *Jackson,* of heroin use to Russian roulette is valid. There can be no question that a person who puts a gun to his head and pulls the trigger, knowing that one of the six cylinders has a live shell in it, is not entitled to insurance coverage should he lose. Yet it cannot be said that the person playing the "game" necessarily intends death. In fact, this hypothetical gambler has only a 16.6% of firing a bullet in his brain. Nonetheless, the substantial certainty of harm to the person who plays such a game with his own life demonstrates he or she is not entitled to benefit from this action.

¶ 36 The person who hands the player the gun knows, with the same substantial certainty, that death attends closely. There can no more be insurance coverage for the action of handing the player the gun than for the person who actually plays the "game". Neither action, the handing

the instrument of demise to the player or actually pulling the trigger, can be termed anything but intentional. So it is with the sale and use of heroin.

¶ 37 It is true that prior to Angela Smith's death, Smith and Greenfield had used heroin before and had no major ill effects. However, this does not support the notion that Greenfield expected nothing would happen this time, negating any substantial certainty that death would occur. Just because he beat the odds in the past does not mean he was going to continue to beat the odds.

¶ 38 If the analogy to Russian roulette may be carried further, the fact that the "player" may have survived several rounds of play in no way lessens the certainty of grievous harm. It cannot be rationally said that having survived three rounds of Russian roulette, the fourth time playing is any more safe that the first three. So it may be said of heroin use. Having ingested, in one manner or another[5], heroin without a resulting hospitalization or death does not lessen the substantial certainty that such harm will follow.

¶ 39 A seller and user of heroin can have no real notion of the strength or purity of the drug. The fact that heroin is one of the most potent of all illegal narcotics coupled with this lack of knowledge can only add to danger inherent in its use. It is immaterial that the seller or user may not know the specific means by which heroin kills or maims. What matters is the sure knowledge that heroin does kill and maim.

¶ 40 We are aware that other jurisdictions impose liability in similar circumstances under a policy with an exclusion for an intentional act. However, we believe that those cases do not fully recognize the nature and character of the sale

---

**5.** Heroin can be smoked, inhaled, injected under the skin or intravenously. There are undoubtedly many other methods of using the drug.

and use of heroin, and therefore we find the logic of *Wiley, Roe,* and the Appellate Courts of Maryland, Georgia and Texas more compelling.

¶ 41 There exist also compelling public policy reasons for denying a claim such as this. In effect, the courts are being asked to help provide insurance for heroin dealers. While it is true that an insurer can put in its policy specific language to exclude such behavior, there should be no reason to do so. As shown above, the legislature of this Commonwealth has already determined the inherent danger of heroin. Other jurisdictions recognize the inherent danger of heroin. It should not be the public policy of this Commonwealth to insure the sale of such a notoriously dangerous and illegal narcotic, limited only by an express clause denying such coverage.

¶ 42 Finally, Smith has argued that even if the actual selling of the heroin prevented coverage, Greenfield's act of leaving Angela Smith the next morning without checking on her condition is a negligent act under Restatement (Second) of Torts § 322, which states:

> If the actor knows or has reason to know that by his conduct, whether tortious or innocent, he has caused such bodily harm to another as to make him helpless and is in danger of further harm, the actor is under a duty to exercise reasonable care to prevent such further harm.

¶ 43 Appellees argue that this negligence would then provide the basis for coverage. We disagree. The actions of Greenfield, throughout this entire episode, are inseparable from the original intentional act. Just as the action and evil of the sale of heroin are inseparable, all consequences that naturally flow from that original act must be deemed part of the intentional act.

¶ 44 There is no doubt that Greenfield has committed an actionable offense against Angela Smith and her family. Nothing in this opinion is meant to signify that the Smiths have no cause of action or rights against Greenfield. However, the nature of the action compels a finding of intent to cause harm, negating any duty of Minnesota Fire and Casualty to either defend or indemnify such conduct.

¶ 45 Judgment reversed and matter remanded to the lower court for entry of judgment in favor of Minnesota on the declaratory judgment petition. Jurisdiction relinquished.

¶ 46 OLSZEWSKI, J., files a Dissenting Opinion.

OLSZEWSKI, J., Dissenting.

¶ 1 I find the majority to have conducted both a thorough and persuasive analysis; however, for the following reasons I must respectfully dissent.

¶ 2 The majority has confused the concepts of intent and expectation as related to this case, and furthermore, improperly extended the concept of inferred intent found in the holdings of *Aetna Cas. and Sur. Company v. Roe,* 437 Pa.Super. 414, 650 A.2d 94 (1994) and *Wiley v. State Farm Fire & Cas. Co.,* 995 F.2d 457 (3d Cir.1993).

¶ 3 This case, complicated and troublesome, requires a strict review of the applicable law, an inquiry into the true nature and consequences of heroin use, and a balancing of the public policy concerns involved. The majority, in a zealous yet commendable condemnation of drug use, strayed from these requirements as their position endeavors to sacrifice established case law, the contracted insurance policy between the parties, and an understanding

of the realities of this tragic situation. Therefore, I must respectfully dissent.

¶ 4 The majority bases its conclusion on the doctrine of inferred intent stated in the aforementioned *Aetna* and *Wiley* holdings. In *Aetna*, we adopted the doctrine of inferred intent from the Third Circuit's *Wiley* decision for limited use in liability insurance cases that involve sexual abuse of a child by an insured adult. *Aetna*, 650 A.2d at 102. Otherwise, the Third Circuit properly concluded that "in adjudicating general liability insurance cases, as opposed to those *exceptional* cases involving sexual child abuse, Pennsylvania courts presently follow the [Superior Court] decision of *United Services Auto. Ass'n v. Elitzky*, 358 Pa.Super. 362, 517 A.2d 982 (1986)." *Wiley*, 995 F.2d at 461 (emphasis added).

¶ 5 In *Elitzky*, we stated that "for the purposes of the insurance policy provision excluding coverage for expected or intended injuries by the insured, 'an insured intends injury if he *desired* to cause such consequences of his act or if he acted *knowing* that such consequences were *substantially certain* to result.'" *Id.* (quoting *Elitzky*, 517 A.2d at 989 (emphasis added)). The *Wiley* court concluded that in Pennsylvania, "for an injury to be excluded from [insurance] coverage, the insured must have specifically intended to cause harm." *Id.*

¶ 6 The *Wiley* court, itself, ultimately limited the applicability of the inferred intent rule stating that "inferring intent to harm is strong medicine ... it has narrow applicability." *Aetna Life and Cas. Co. v. Barthelemy*, 33 F.3d 189, 192 (3d Cir. 1994).

¶ 7 Even if it could be applied in this case, the threshold requirements of intent and substantial certainty of injury must be met; and the rule is then only to be applied when the degree of certainty that

injury will result is sufficiently great. *Id.* I do not believe Greenfield intended and was substantially certain that Smith's death was forthcoming after he handed her the heroin. Had the threshold requirements been satisfied, however, I further believe that the degree of certainty that Greenfield's conduct would cause Smith's death is not sufficiently great enough to justify inferring intent to injure as a matter of law. The sale of heroin, although repugnant, does not rise to the level of the exceptional cases of sexual abuse of children.

¶ 8 The case at bar does not involve sexual molestation of children, or even sexual assault, and as such, is not amenable for the application of the inferred intent rule. Greenfield, in supplying Smith with heroin, cannot be said to have specifically intended to cause the resulting harm in this case, *i.e.*, Smith's death.

¶ 9 The fact that Greenfield intentionally supplied Smith with heroin is not disputed. From that, however, I cannot find that he intended Smith's death, or that it was obvious that death would result. National statistics support the conclusion that heroin use does not consistently produce death to the point that it could be logically expected and intended amongst addicts. The fact alone that heroin has "addicts" flies in the face of the majority's reasoning.

¶ 10 In 1998, DEA officials testified to members of Congress that only four thousand (4,000) of the close to one million (1,000,000) heroin addicts in the United States die each year from heroin related causes. DEA CONGRESSIONAL TESTIMONY OF THOMAS A. CONSTANTINE, DEA ADMINISTRATOR, 1998. Statistically, this represents a lower percentage than those Americans who die from tobacco related causes. *Id.* This seems to belie the majority's claim that

death can be or should be expected from heroin use. Surely, someone who provides a friend with a cigar cannot be said to have intended or expected the friend's death should the friend eventually die of heart disease; a result, notably, more likely to occur than death from heroin use. CANCER FACTS AND FIGURES, AMERICAN CANCER SOCIETY, 1999; DEA CONGRESSIONAL TESTIMONY OF THOMAS A. CONSTANTINE, DEA ADMINISTRATOR, 1998.

¶ 11 Adverse effects of heroin use certainly can be expected and are widely known, including the short-term effects of depressed respiration, clouded mental functioning, nausea and vomiting; as well as the long-term effects of collapsed veins, bacterial infection, abscesses, arthritis, and infection of heart lining and valves. HEROIN INFOFAX, NATIONAL INSTITUTE ON DRUG ABUSE. Death, however, is not listed among the expected results. In fact, the National Institute on Drug Abuse does not include death as an effect of heroin. HEROIN INFOFAX, NATIONAL INSTITUTE ON DRUG ABUSE.

¶ 12 Greenfield knew that Smith would ingest the heroin and come under its powerful, disabling effects. He even may have been aware of or anticipated the possible contraction of potential infections and various vein disorders by Smith. It cannot be said, however, that because Greenfield intended that Smith use the heroin and was aware of the potential dangers, that he intended or was "specifically certain" that her death would result. Actually, the record only reveals that Greenfield intended and expected that Smith lock the house when she left.

¶ 13 The majority extensively analogizes heroin use to Russian Roulette, yet such a comparison is unfounded and invalid. In Russian Roulette, if the player survives to the sixth round, death can be expected with absolute certainty. That certainty does not hold true with continued heroin use. A more fitting analogy is a tobacco-related death. While death remains a possibility, there exist far more short-term and long-term effects that are substantially certain to occur.

¶ 14 The events of that evening were tragic, negligent, and a testimony to the perils of heroin use. Yet, as such, they constitute an occurrence under the terms of the insurance policy. No exclusion applies, because while the sale of heroin by Greenfield was intentional, the injury in question, the death of Smith, was neither expected nor intended. The insurance policy's business pursuit exception does not apply either, as the continuity of activity and profit motive requirements are both lacking.

¶ 15 Additionally, Minnesota Fire and Casualty sold an insurance policy that did not comprehensively articulate the parameters of its coverage, specifically lacking a criminal conduct exception. Such conduct should not be encouraged; and to avoid defending in such cases, insurance companies should directly address criminal conduct.

¶ 16 The majority proposes to disregard the insurance policy provisions and case law in an attempt to further expose the evils of drug use. While a noble goal, this case is not the proper means for accomplishing such ends.

¶ 17 Therefore, I respectfully dissent.