855 A.2d 854

**MINNESOTA FIRE AND CASUALTY COMPANY, Appellee,**

**v.**

**Michael J. GREENFIELD, Sharon Smith and Arlin C. Smith, Individually and as Administrators of The Estate of Angela C. Smith, Appellants.**

Supreme Court of Pennsylvania.

Argued Dec. 2, 2003.

Decided Aug. 19, 2004.

John Richard Fenstermacher, Esq., Mechanicsburg, for Michael J. Greenfield, et al.

William T. Salzer, Esq., Kori Ann Connelly, Esq., Philadelphia, for Minnesota Fire and Casualty Company.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, and LAMB, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice NEWMAN.

We must decide today whether an insurance company owes a duty to defend or indemnify a homeowner for the wrongful death of his houseguest occasioned by his selling heroin to her. For the reasons that follow, we affirm the holding of the Superior Court, albeit on different grounds, that no such obligation exists.

### FACTS AND PROCEDURAL HISTORY

At 8 p.m. on February 9, 1998, eighteen year-old Angela Smith (Smith) arrived at the home of Michael J. Greenfield (Greenfield) at 600 North Third Street, in Wormleysburg, hoping to obtain some heroin from him. Another young woman, Brook Broadwater (Broadwater), was with Smith. When they arrived, Greenfield had been drinking Mad Dog beer and was under the influence of marijuana and heroin.

Greenfield was no stranger to the use of heroin,[1] having lost consciousness three times from it in the past. Original Record (Record), Deposition Testimony of Michael J. Greenfield, December 13, 2000 (Greenfield Deposition), at 120–21. He was using heroin on a daily basis. *Id.* at 147. He had used heroin with Smith before, and she, too, had become unconscious twice from it. *Id.* at 121–22. Greenfield had sold heroin to Smith on other occasions and was arrested in 1995 for possession of marijuana. *Id.* at 124. Greenfield acknowledged that he sold drugs out of his house "occasionally;" for the most part, he sold "mostly just weed" and "didn't really sell heroin to too many people." *Id.* at 141–42.

In exchange for some marijuana and a small sum of money, Greenfield provided Smith with a bag of heroin, which was labeled "Suicide." At approximately 8:20 p.m., Smith voluntarily injected herself with the heroin. From that time until 10 p.m., Smith lay in a chair and communicated only when directly addressed. Greenfield put out some blankets for her, and she went to sleep on the floor. Greenfield left with Broadwater, returning to the house approximately 10:45 p.m. *Id.* at 131. Smith remained in the residence, and when Greenfield awoke around 6:30 a.m., he found Smith still on the floor. *Id.* at 132. When he left for work, he told Smith to lock the door if she left, and Smith groggily responded. *Id.*

When Greenfield came home from work later that day, he found Smith dead on the floor where he had left her that morning. Greenfield knew that she was dead because "she was pale and not breathing." *Id.* at 145.[2] Autopsy results

1. Heroin is a Schedule I controlled substance, pursuant to The Controlled Substance, Drug, Device and Cosmetic Act, 1972, April 14, P.L. 233, No. 64, § 1, eff. June 14, 1972, 35 P.S. § 780–101 *et seq.* (The Controlled Substance Act). A Schedule I controlled substance is one with "a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision." 35 P.S. § 780–104(1).

2. Ironically, when Greenfield arrived home from work, the police chief was outside of his door because Greenfield had a broken headlight, and the chief "was checking to make sure [that he] fixed it." The police chief did not know that Smith was dead inside the house, and when Greenfield discovered her body, he did not call the police, explaining

showed that Smith died from a heroin overdose. Greenfield called a friend, Robert Rollins (Rollins), who came to his residence. *Id.* at 147. Wearing gloves because he "didn't want to touch" Smith's dead body, Greenfield, with his friend, took the body and put it in a vehicle owned by Greenfield. *Id.* at 148. They drove around the area, and then dumped the body in York County near the Yellow Breeches Creek. *Id.* at 257. Greenfield then contacted the police and concocted a story to the effect that he had simply found a body near the creek. Rollins initially told the same story, but recanted and told the truth. The men were arrested later that same day.

Greenfield was charged criminally for the outcome of the death of Smith; he pled guilty and was sentenced on counts of involuntary manslaughter,[3] abuse of a corpse,[4] and unlawful delivery of heroin.[5] During the guilty plea colloquy, counsel stated that the maximum penalty on the felony charge (unlawful delivery of Schedule I controlled substance) is five years and $15,000.00; for the misdemeanor one (involuntary manslaughter), it is five years and fine; and for the misdemeanor

that he was scared "[b]ecause of drugs, being high and stuff. I didn't know what to do." *Id.* at 145–46. In reviewing the entire Record, there is not one scintilla of evidence to suggest that Greenfield felt remorse or personal responsibility for the death of Smith. He seems to have little conscience or regret for what transpired.

3. 18 Pa.C.S. § 2504. Involuntary manslaughter
 (a) General rule.—A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person. (b) Grading.—Involuntary manslaughter is a misdemeanor of the first degree. Where the victim is under 12 years of age and is in the care, custody or control of the person who caused the death, involuntary manslaughter is a felony of the second degree.

4. 18 Pa.C.S. § 5510 provides that "[e]xcept as authorized by law, a person who treats a corpse in a way that he knows would outrage ordinary family sensibilities commits a misdemeanor of the second degree."

5. 35 Pa.C.S. § 780–113(a)(30) provides that "[t]he following acts and the causing thereof within the Commonwealth are hereby prohibited: ... the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act...."

two (abuse of corpse), it is two years and fine. Record at 77–78. Also during the colloquy, counsel indicated that Greenfield had been confined in York County prison (the county in which the body was found) and then sent to Cumberland County prison. When he was on bail in York County, the charges there were dropped, and he was arrested on Cumberland County charges. Record at 82. At the deposition, Greenfield stated that he made bail, (he testified that "I think it was $25,000.00" at first and then "they raised it to $200,000.00") and then he pled guilty and went back to jail, with two more incarcerations. Record at 155–56. Outside of these sketchy references, the Record does not contain other evidence regarding the sentence.

Greenfield obtained a homeowner's policy (the Policy) from Minnesota Fire and Casualty Company (Insurance Company) when he purchased his residence. This was the Policy in place when Smith died, and it provided as follows:

Section II, Coverage E—Personal Liability

If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the insured is legally liable; and

2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the occurrence equals our limit of liability.

Record, Exhibit B at 31.

The Policy defines **"occurrence"** as **"an accident,"** including exposure to conditions, **which results,** during the policy period, **in: a. bodily injury;** or b. property damage. Record, Exhibit B at 22. "Bodily injury" is "bodily harm, sickness or disease, including required care, loss of services and death that result." *Id.* However, **the Policy excludes coverage for**

bodily injury "which is expected or intended by the insured." Record, Exhibit B at 32. Bodily injury "arising out of business pursuits of an insured" is also excluded. *Id.* "Business" is defined as a "trade, profession or occupation." Record, Exhibit B at 22.

On June 10, 1999, Sharon L. Smith and Arlin C. Smith, the parents of Smith, filed wrongful death and survival actions against Greenfield in the Court of Common Pleas of Cumberland County (trial court), individually and on behalf of all the other beneficiaries of the Estate of Angela C. Smith, as administrators of that Estate. They alleged, *inter alia,* that: (1) Greenfield had sold heroin to Smith; (2) he knew of, or should have foreseen, the harmful and dangerous consequences of selling heroin to Smith; (3) he made no attempts to check on her condition during the evening of February 8, 1998, and the following morning; and (4) he made no attempt to revive her, instead, leaving her and going to work.

The Insurance Company filed a Declaratory Judgment Action in the trial court, claiming, *inter alia,* that:

> The allegations of the *Smith* Complaint do not trigger an obligation on the part of Minnesota Fire and Casualty to either defend or indemnify [Greenfield] for the allegations of liability set forth herein. The damages sought in the *Smith* Complaint are alleged to have been caused by the sale of heroin by Greenfield to [Smith] resulting in [Smith's] death. These allegations do not constitute "an occurrence," i.e., an accidental event; rather the allegations are premised solely upon the intentional and criminal act of the insured of selling heroin, a controlled substance.

Complaint in Equity—Declaratory Judgment Action, ¶ 12.

The Insurance Company further alleged that it had no legal obligation to defend or indemnify Greenfield on the ground that public policy bars the insurance coverage asserted. Complaint in Equity—Declaratory Judgment Action, ¶ 19.

On March 14, 2001, the trial court ruled on the parties' Cross–Motions for Summary Judgment, which sought summary judgment regarding a duty of the Insurance Company to

defend and indemnify Greenfield in the wrongful death and survival action. Our Court held in *General Accident Insurance Co. of America v. Allen,* 547 Pa. 693, 692 A.2d 1089, 1095 (1997), that "[i]f the complaint ... avers facts that would support a recovery covered under the policy, then coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery that the policy does not cover." Based on its application of *Allen,* the trial court ordered the Insurance Company to defend the case and sustain any ultimate liability. Opinion of the Trial Court at page 2. The court cited *United Services Automobile Association v. Elitzky,* 358 Pa.Super. 362, 517 A.2d 982 (1986), *petition for allowance of appeal denied,* 515 Pa, 600, 601, 528 A.2d 957 (1987), which involved a homeowner's insurance policy with an exclusionary clause identical to the one presently before the Court; i.e., it did not cover liability for bodily injury "which is expected or intended by the insured." In *Elitzky,* the court stated that "the exclusionary clause applies only when the insured intends to cause a harm. Insurance coverage is not excluded because the insured's actions are intentional unless he also intended the resultant damage." *Id.* at 987. Relying on that, the trial court in the case *sub judice* found that although the Complaint alleged an intentional act by Greenfield, i.e., supplying heroin to Smith, there were no averments alleging or reasonably inferring that Greenfield expected or intended to cause her death. With respect to the duty to defend and indemnify, the trial court cited *Mutual Benefit Insurance Company v. Haver,* 555 Pa. 534, 725 A.2d 743 (1999), which noted that "[t]he particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered. Instead it is necessary to look at the factual allegations contained in the complaint." *Id.* at 745. Finding that the Complaint alleged negligence and contained no averments that Greenfield intended to cause the death of Smith, the trial court held that the Insurance Company had the duty to defend him in the wrongful death and survival action until it could confine the claim to a recovery not within the scope of the Policy.

The Opinion and Order of the trial court denied the Insurance Company's Motion for Summary Judgment, applying the standard of review that requires it to "view. the record in a light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." Opinion and Order of the Trial Court at 9–10 (citing *Washington v. Baxter*, 553 Pa. 434, 719 A.2d 733 (1998)). The court found that the record "does not, as a matter of law, show that the Smiths' claim is excluded under Minnesota's policy." *Id.* at 10. The trial court, however, did not grant the Smiths' Motion for Summary Judgment on the issue of indemnification, finding that the Insurance Company was required to defend Greenfield until the claim could be confined to a recovery that was not within the scope of the Policy.

The Superior Court reversed and determined that two factors precluded coverage: (1) its expanded doctrine of "inferred intent," which had been applied previously in Pennsylvania only to cases involving child abuse. *Minnesota Fire and Casualty Company v. Greenfield*, 805 A.2d 622 (Pa.Super.2002); and (2) public policy. The court noted "compelling public policy reasons" to deny coverage, for, "[i]n effect, the courts are being asked to help provide insurance for heroin dealers.... [T]he legislature ... has already determined the inherent danger of heroin.... It should not be the public policy ... to insure the sale of such a ... dangerous and illegal narcotic...." *Id.* at 630.

Relying on *Aetna Casualty and Surety Company v. Roe*, 437 Pa.Super. 414, 650 A.2d 94 (1994), which adopted in Pennsylvania the idea of inferred intent in child abuse cases, the Superior Court in the instant matter stated that "[i]nferred intent results when there is an intentional act on the part of the insured and it is inherent in that act that harm will occur. In child abuse cases, the actor's abuse will frequently cause long-term harm to the child." *Greenfield*, 805 A.2d at 624. Reasoning that it was frequently certain that harm would occur to the buyer of heroin, the Superior Court extended the doctrine of inferred intent, vacated the trial

court Order, and remanded with instructions to enter an Order holding that the Insurance Company had no duty either to defend or to indemnify Greenfield. Judge Olszewski dissented, rejecting the extension by the majority of the concept of inferred intent, noting that the doctrine was intended only for "exceptional cases involving sexual child abuse. . . ." *Id.* at 631 (internal citations omitted).

Greenfield filed a Petition for Allowance of Appeal with this Court, raising one issue, which was whether the Superior Court erred in extending the concept of inferred intent to cases involving general liability insurance coverage. We granted allocatur on April 22, 2003. For the reasons that follow, we determine that although the Superior Court erred in expanding the inferred intent doctrine, it reached the correct result in determining that public policy precludes the Insurance Company from any duty to defend or indemnify Greenfield.

## DISCUSSION

As we explained, the question before us is whether the Insurance Company must defend or indemnify Greenfield for the wrongful death of Smith resulting from heroin that he sold to her.

In this case, the Insurance Company filed a declaratory judgment action, which the trial court addressed pursuant to Cross–Motions for Summary Judgment filed by both parties. The court denied the Insurance Company's Motion for Summary Judgment, granted the Motion of the defendants regarding the Insurance Company's duty to defend Greenfield, and denied the defendants' Motion for Summary Judgment seeking indemnification of Greenfield by the Insurance Company. Our scope of review of an order granting summary judgment is plenary, and we will reverse the order of a trial court only where the court committed an error of law or clearly abused its discretion. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218 (2002). When reviewing an order granting summary judgment, "[t]he reviewing court

must view the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party." *Id.* at 1221 (internal citations omitted).

The interpretation of an insurance contract regarding the existence or non-existence of coverage is "generally performed by the court." *Allen*, 692 A.2d at 1093. "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer. . . . Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers' Association Insurance Company*, 512 Pa. 420, 517 A.2d 910, 913 (1986). In light of the fact that the appropriate construction of the Policy poses a question of law, our standard of review is plenary. *Sahutsky v. H.H. Knoebel Sons*, 566 Pa. 593, 782 A.2d 996 (2001).

Based on our analysis, we conclude that the trial court erred as a matter of law when it found that the Insurance Company is required to defend Greenfield and when it held that public policy does not prohibit insurance coverage for the death of Smith. We reject the Superior Court's extension of the doctrine of inferred intent to general liability insurance matters as inappropriate and unnecessary to the resolution of this case. We agree with the result that the Superior Court reached in reversing the trial court; however, we affirm only that part of its holding that determines that public policy precludes coverage under the Policy.

The Superior Court asserted two reasons for reversing the trial court: (1) Greenfield intentionally supplied Smith with the heroin that caused her death and, although he may not have intended her death, the known risks of heroin use make an adverse reaction an "expected occurrence;" and (2) "[i]t should not be the public policy of this Commonwealth to insure the sale of such a notoriously dangerous and illegal narcotic, limited only by an express clause denying such coverage." *Greenfield*, 805 A.2d at 626, 630.

We will address only the issues that the parties raised, although there appears to be an argument based on contract interpretation that the Insurance Company did not advance.[6]

6. Mr. Justice Castille articulates in his Concurring Opinion that it would be preferable to resolve this matter by principles of contract construction. He notes that the definition of "occurrence" in the Policy requires an "accident," and that the heroin transaction between Greenfield and Smith was not an accident. Although his argument is appealing, the fact is that Greenfield sought allowance of appeal on only one issue, which was the alleged error of the Superior Court in extending the doctrine of inferred intent to this matter. The Court on appeal considers only questions set forth in the Petition. Pa.R.A.P. 1115(a)(3). Further, what could have been a relatively simple case of contract interpretation has been complicated unnecessarily by the failure of the Insurance Company to advance in an adequate manner an argument that the death of Smith was not an occurrence because it was not an accident. The parties and the Superior Court focused on whether or not Greenfield intended the death of Smith. However, the Superior Court and the Insurance Company have overlooked this key determinant of coverage cited by Mr. Justice Castille.

It initially appeared from the Declaratory Judgment Action that the Insurance Company would be making this argument, when it stated that:

The allegations of the *Smith* Complaint do not trigger an obligation on the part of Minnesota Fire and Casualty to either defend or indemnify [Greenfield] for the allegations of liability set forth therein. The damages sought in the *Smith* Complaint are alleged to have been caused by the sale of heroin by Greenfield to the decedent resulting in the decedent's death. These allegations do not constitute "an occurrence," i.e., an accidental event; rather, the allegations are premised solely upon the intentional and criminal act of the insured of selling heroin, a controlled substance.

Complaint in Equity–Declaratory Judgment Action, ¶ 12. However, the Insurance Company failed to brief the position that there is no occurrence if there is no accident; instead, it relied on the language in the exclusions section that the death was not "expected or intended by the insured."

This Court has held before that an occurrence requires an accidental event. See *Gene's Restaurant, Inc. v. Nationwide Insurance Company*, 519 Pa. 306, 548 A.2d 246 (1988) (where a willful and malicious assault of a restaurant patron was not an occurrence, because the policy defined "occurrence" as an "accident." In a footnote we stated that the "[r]estaurant argues that because it neither 'expected' nor 'intended' [the victim's] injuries, [the insurance company] had a duty to defend. Such a reading ignores the policy requisite that the 'occurrence' must be an accident which a malicious, willful assault and beating could never be." *Id.* at 247 n. 1).

Indeed, maintaining the posture of an "accident" successfully may well have proved impossible, given that the bag of heroin provided to Smith was labeled "Suicide," and that Greenfield testified that he had wit-

The Superior Court and the Insurance Company focused their analyses on that part of the Policy that excludes coverage for injuries that are "expected or intended by the insured."[7] The question concerning whether Greenfield "expected or intended" Smith to die when he provided her with heroin is certainly difficult to answer, as reflected by the fact that the trial court and the Superior Court came to opposite conclusions. The trial court found that the averred facts support that the death of Smith was caused by the **negligence** of Greenfield; and the Superior Court inferred that "an intent to cause injury existed as a matter of law due to … Greenfield's providing Angela Smith with what … all too predictably, proved to be a fatal dose of heroin." *Greenfield,* 805 A.2d at 624.

When this Court first considered the effect of a similar exclusionary clause in a homeowner's policy, we stated that "the vast majority of courts which have considered such a provision [an exclusionary clause] have reached the conclusion that before the insurer may validly disclaim liability, it must be shown that the insured intended by his act to produce the damage which did in fact occur." *Eisenman v. Hornberger,* 438 Pa. 46, 264 A.2d 673–74 (1970) (internal citations omitted). We emphasized in that case the difference between intending an **act** and intending a **result**.[8] In *Eisenman,* we held that the exclusionary clause did not preclude coverage for damages caused by a house fire during the course of a burglary.

nessed Smith lose consciousness from heroin on at least two other occasions. Clearly, the victim had visited the brink of disaster in the past; her death did not occur in a vacuum. Further, in the case *sub judice,* Greenfield pleaded guilty to involuntary manslaughter. "A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner … he causes the death of another person." 18 Pa.C.S. § 2504(a). By pleading to this charge, Greenfield acknowledged that the death of Smith was the "direct result" of his "unlawful act."

7. The Policy provides for certain other exclusions, as well, which are not relevant to the instant appeal. Record, Exhibit B at 32.

8. We stated that "the question is not whether the dropping of the matches was an 'intentional act,' but rather whether the resulting property damage was 'intentionally caused' by the insured." *Eisenman,* 264 A.2d at 674.

Further, we found that although the perpetrators intended to burglarize the house, they did not anticipate or plan the resulting house fire occasioned by their use of matches to light their way in the dark.

The trial court found that "the facts averred support Smiths' allegation that the death of Angela Smith was caused by Greenfield's negligence." Opinion and Order of the Trial Court at 5. It is in the context of this jurisprudential background that the Superior Court extended and applied the doctrine of **inferred** intent, presumably for the reason that it was unable to establish **actual** intent, given the absence of allegations that Greenfield expected or intended Smith to lose consciousness or die. The earlier ruling of the Superior Court in *Elitzky*, which involved an identical exclusionary clause, was consistent with our articulation of the standard in *Eisenman*. "An insured will only be covered if he causes a harm of a generally different type than that which he set out to cause." *Elitzky*, 517 A.2d at 988. The harm that occurred in the case *sub judice* is exactly the type of evil inherent in the use of heroin. Sometimes, users are fortunate and suffer no ill effects; other times, they lose consciousness; in the worst of all scenarios, they die.

The Superior Court stated that "the notion of inferred intent is accepted in Pennsylvania," *Greenfield*, 805 A.2d at 625; however, the concept has not been extended beyond child sexual abuse cases. "In adjudicating general liability insurance cases, as opposed to those **exceptional** cases involving child sexual abuse, Pennsylvania courts presently follow [*Elitzky*]." *Wiley v. State Farm Fire and Casualty Co.*, 995 F.2d 457, 461 (3d Cir.1993) (emphasis added). *Wiley* noted the very narrow applicability of inferred intent and stated that "in cases that do not involve child sexual abuse, Pennsylvania has adopted a general liability standard for determining the existence of this specific intent that looks to the insured's actual subjective intent." *Id.* at 460.

■ Jurisprudence in Pennsylvania does not support the extension of inferred intent to cases other than exceptional

ones involving child sexual abuse. Although this Court is not bound by the precedent established in a subsequent diversity case based on the law of Pennsylvania, we note that the Third Circuit has refused to extend the doctrine of inferred intent to preclude coverage for harm suffered by a female college student after a sexual assault by the homeowner's son. In *Aetna Life and Casualty Company v. Barthelemy*, 33 F.3d 189 (3d Cir.1994), the homeowner's policy contained an exclusionary clause identical to the one in the case *sub judice*. The Aetna policy excluded from personal liability and coverage "bodily injury or property damage . . . which is expected or intended by any insured. . . ." *Id.* at 191. The court stated that:

> Pennsylvania case law teaches us how to begin an analysis of exclusionary clauses of the type contained in the Barthelemy's homeowner's policy:

> In our state, the exclusionary clause applies only when the insured intends to cause a harm. Insurance coverage is not excluded because the insured's actions are intentional unless he also intended the resultant damage. The exclusion is inapplicable even if the insured should reasonably have foreseen the injury which his actions caused. *Elitzky*, 517 A.2d at 987 (citation omitted). The homeowner's policy in this case excluded bodily injury or property damage which is expected or intended by any insured.

* * *

Although *Elitzky* mandates a subjective intent analysis for determining coverage under an exclusionary clause in most Pennsylvania insurance cases, a different analysis is applied in those exceptional cases involving sexual child abuse. *Wiley*, 995 F.2d at 460. In those exceptional cases, many jurisdictions have adopted what is called the inferred intent rule: This rule allows a court to infer an actor's intent from the nature and character of his or her acts and to establish conclusively the existence of intent to harm as a matter of law. *Id.* This presumption is conclusive 'notwithstanding the insured's assertion of an absence of subjective intent to

harm. *Id.* Intent may be inferred only if the degree of certainty that the conduct will cause injury is sufficiently great to justify inferring intent to injure as a matter of law. . . . [T]he more likely harm is to result from certain intentional conduct, the more likely intent to harm may be . inferred as a matter of law.' *Id.* at 462 (internal quotation omitted).

\* \* \*

Inferring intent to harm is strong medicine. We noted in *Wiley* that it has narrow applicability. *Id.* We cautioned repeatedly that, in cases that do not involve sexual child abuse, Pennsylvania has adopted a general liability standard for determining the existence of this specific intent that looks to the insured's actual subjective intent. *Id.* at 460.

*Barthelemy,* 33 F.3d at 191–92. As in *Barthelemy,* there are specific differences between the facts before this Court and those in *Wiley:* (1) in *Wiley,* the victim was a child; (2) in *Wiley,* there was no contention that the victim had consented; and (3) in *Wiley,* both participants were not intoxicated.[9] Reiterating that the "entire discussion in *Wiley* was limited to sexual assault on a child[,]" the Third Circuit held that with respect to inferring intent, "[w]here a child is not a participant in the act, there is no reason for the rule." *Barthelemy,* 33 F.3d at 193. In the case before us, neither Greenfield nor Smith was a child. Each acted voluntarily in a transaction that the laws of this Commonwealth criminalize: Greenfield sold the heroin, and Smith injected it.

The incursion by the Superior Court into the territory of inferred intent was unnecessary with respect to reaching a determination of non-coverage. If it had followed its own analysis in *Germantown Insurance Company v. Martin,* 407 Pa.Super. 326, 595 A.2d 1172 (1991), *petition for allowance of appeal denied,* 531 Pa. 646, 612 A.2d 985 (1992), it would have arrived at the same place without the detour. In that case, an insured went on a shooting spree, killing several occupants of

9. In *Wiley,* the adult perpetrator was intoxicated; there is no evidence even suggesting that the child victim was intoxicated.

a house. The court held that there was no coverage pursuant to the perpetrator's homeowner's policy for the reason that the conduct of shooting was intentional and, in applying the *Elitzky* standard, the conduct was excluded under the policy "as it is exactly the type of injury against which insurance companies are not and should not be expected to insure." *Id.* at 1175. The court found no evidence that the shooting was "accidental or negligent" and also determined it irrelevant that the insured did not know the identity of one of the victims or that the victim was present in the house. Further, the court held that notwithstanding its finding that coverage was excluded under the terms of the policy, "we would also find coverage excluded as violative of the public policy of Pennsylvania." *Id.* "The courts of Pennsylvania have refused to require an insurer to defend an insured for his own intentional torts and/or criminal acts." *Id.* (internal citations omitted). Based on this and the facts in the case *sub judice*, there is no coverage under the Policy given that Greenfield and Smith were voluntary participants in a criminal transaction involving heroin, a Schedule I controlled substance, that directly caused Smith's death.

We cannot know with certainty what Greenfield's state of mind was, a fact neither necessary to nor dispositive of our decision. We do ratify existing principles of our jurisprudence and, by doing so, we reject the Superior Court's extension of inferred intent, which established, as a matter of law, that Greenfield intended the harm that befell Smith.

 Having said that, however, the Superior Court's determination that the Insurance Company is not required to defend or indemnify under the Policy is correct. In addition to applying an expanded inferred intent doctrine, the court based its determination on the "compelling public policy reasons for denying a claim such as this [where, i]n effect, the courts are being asked to help provide insurance for heroin dealers." *Greenfield,* 805 A.2d at 630. The court reiterated that heroin is a Schedule I controlled substance,[10] and that its

10. The Superior Court gave an incorrect citation for the Controlled Substance Act. Heroin is listed at Schedule I at 35 P.S. § 780–104(1)(ii)(10).

sale and possession for use or delivery are illegal.[11] The court cited the many reasons for the illegality of heroin, including its "inherent harm ... [and] not only the harm caused to society in terms of costs and quality of life, but the real and devastating harm done to the user." *Id.* at 627.

In *Eisenman,* we rejected an argument that allowing recovery pursuant to an insurance policy where property damage arose out of the commission of a crime by the insured would contravene public policy. We did so for two reasons: (1) the insurance contract itself did not contain a "violation of law" clause; and (2) our analysis that "under the facts of this case,

35 P.S. § 780–104(1)(ii)(10) (emphasis added).

11. 18 Pa.C.S. § 7508(a)(7) provides that:

A person who is convicted of violating section 13(a)(14), (30) or (37) of The Controlled Substance, Drug, Device and Cosmetic Act where the controlled substance or a mixture containing it is heroin shall, upon conviction, be sentenced as set forth in this paragraph:

(i) when the aggregate weight of the compound or mixture containing the heroin involved is at least 1.0 gram but less than 5.0 grams the sentence shall be a mandatory minimum term of two years in prison and a fine of $5,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; however, if at the time of sentencing the defendant has been convicted of another drug trafficking offense: a mandatory minimum term of three years in prison and $10,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity;

(ii) when the aggregate weight of the compound or mixture containing the heroin involved is at least 5.0 grams but less than 50 grams; a mandatory minimum term of three years in prison and a fine of $15,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; however, if at the time of sentencing the defendant has been convicted of another drug trafficking offense: a mandatory minimum term of five years in prison and $30,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; and

(iii) when the aggregate weight of the compound or mixture containing the heroin involved is 50 grams or greater: a mandatory minimum term of five years in prison and a fine of $25,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; however, if at the time of sentencing the defendant has been convicted of another drug trafficking offense: a mandatory minimum term of seven years in prison and $50,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity.

we are not confronted with any overriding public policy which would preclude recovery." *Eisenman,* 264 A.2d at 675.

Our decision in that case determined that an insurance company was required to indemnify against losses caused by a carelessly lit match that was dropped when teenagers were burglarizing a home. We supported our holding on two bases: (1) the widely accepted principle that "before the insurer may validly disclaim liability, it must be shown that the insured intended by his act to produce the damage which did in fact occur[;]" and (2) the absence of any "overriding public policy" to preclude recovery. *Eisenman,* 264 A.2d at 674–75 (internal citation omitted).

■ Using our analysis in the case at bar, and providing further refinement of our thirty-four year-old holding in *Eisenman,* we find that recovery is precluded for damages that arise out of an insured's criminal acts regarding a Schedule I substance, as a matter of overriding public policy. Therefore, in situations when an insured commits a criminal act, with respect to a Schedule I controlled substance, and unintended or unexpected injuries or losses occur as a result, whether by accident or negligence, public policy will not allow coverage under the contract of insurance.

However, in cases that do not involve a criminal act by an insured with respect to a Schedule I controlled substance, our decision in *Eisenman,* reiterating the test traditionally required for an insurer to disclaim liability; i.e. the insurer must prove that the insured intended by his act to produce the damage which did actually occur, retains its validity.

■ The Court in *Eisenman* was distressed at the lack of a violation of law clause in the insurance policy there.[12] It is

12. The dissent wrongly casts the majority into the role of a "super-scrivener," based on our holding that damages arising from an insured's criminal acts are excluded, even when the specific crimes are not listed by name in the policy. Dissenting Opinion at 363, 855 A.2d at 872. This view fails to recognize that it is the **legislature** that has acted as scrivener, by criminalizing specific acts, one of which is the possession, use, or sale of heroin. Although the Insurance Company may reap a benefit from our holding, this alone cannot allow the Court

obvious that a homeowner's policy is not designed to protect a drug dealer from personal liability for supplying heroin that results in the death of his houseguest.[13] "Only dominant public policy" justifies the invalidating of a contract on the basis of public policy, and one such indication of that policy is "statutory enactments." *Burstein v. Prudential Property and Casualty Insurance Company*, 570 Pa. 177, 809 A.2d 204, 207 (internal citations omitted). If the explicit criminalization of use or possession or sale of drugs that have a high potential for abuse, no currently accepted medical use in the United States, and lack of accepted safety for use under medical supervision does not manifest convincing proof of public interest, what would? While we were "loath to insert [a 'violation of law'] clause for the greater protection of the insurer" in *Eisenman*, public policy demands that we do so now and in every case where a loss has arisen from the insured's commission of a crime involving the sale, use, or possession of a Schedule I controlled substance. *Id.* at 675.[14]

to lend its efforts to require reimbursement for damages arising out of the conduct of a policyholder that our legislature has defined as illegal.

13. When this Court interprets an insurance policy, it is our duty to "ascertain the intent of the parties as manifested by the language of the written agreement." *Haver*, 725 A.2d at 746 (quoting *Standard Venetian Blind Company*, 503 Pa. 300, 469 A.2d 563, 566 (1983)). Greenfield bought the Policy because the lender required it to purchase the home. Record, Exhibit H, Deposition Testimony of Michael J. Greenfield, December 13, 2000 (Deposition) at 119. Greenfield also testified that the purpose of a prior renter's policy he purchased for an earlier residence was to cover things that were stolen. Record, Exhibit H, Deposition at 115. No party has argued that Greenfield purchased the Policy to insure against injuries or death occasioned by heroin. Further, as noted by Mr. Justice Saylor in his Concurring Opinion, "it cannot be reasonably maintained that the parties to the insurance contract anticipated that the homeowner's involvement in the drug overdose of another would give rise to a covered risk." Concurring Opinion at 360, 855 A.2d at 871 (citing RESTATEMENT (SECOND) OF CONTRACTS § 178(2)(a) providing that, in weighing the enforcement of a contractual provision in connection with public policy grounds, the parties' justifiable expectations must be considered). As the Insurance Company explains, "homeowners insurance policies were not designed to protect drug dealers from personal liability arising from the sale of illegal and lethal drugs." Brief of Appellee at 25.

14. Two earlier decisions of this Court are helpful with respect to our analysis of public policy. In *BLaST Intermediate Unit 17 v. CNA*

We reviewed another liability policy with a similar exclusionary clause in *Haver*, where an insured pharmacist distributed medication without prescriptions. The insurance policy explicitly excluded coverage for "bodily injury or property damage whether or not expected or intended by the insured, which is a consequence of an insured's willful harm or knowing endangerment." *Haver*, 725 A.2d at 745. An argument was made that the policy was ambiguous because it contained, in conjunction with the exclusionary language, an endorsement that provided coverage for "professional liability," including "malpractice." *Id.* at 746. We rejected that contention, holding that

> *Insurance Companies*, 544 Pa. 66, 674 A.2d 687 (1996), we held that public policy did not relieve the duty of an insurer to indemnify its insured (BLaST) for the insured's negligent but good faith violation of the federal equal pay statute. BLaST sought indemnification for damages it had to pay female teachers' aides as a result of its violation of the Equal Pay Act. We determined that there was no legitimate public policy reason to disallow a loss caused by a negligent statutory violation. *Id.* at 691. We distinguished our holding in *BLaST* from our earlier determination in *Central Dauphin School District v. American Casualty Company*, 493 Pa. 254, 426 A.2d 94 (1981). In *Central Dauphin*, the School District sought to recover from its insurance carrier monies it was required to return to taxpayers as a result of an illegal tax it had levied on them. We stated in *BLaST* that while "BLaST's statutory violation can not be condoned ... it does not raise the same public policy concerns as the Central Dauphin School District's unlawful taxing measure." *BLaST*, 674 A.2d at 690. Regarding the unlawful tax collections that the Central Dauphin School District imposed, we emphasized in *BLaST* that it
>
> > was never entitled to revenue from the taxes. Clearly, there was no loss to the school board; rather, the school board would have realized a windfall if allowed to collect from its insurance carrier after refunding the taxes. It was obviously against public policy to allow the school district to use unlawful activity as a money-making endeavor.
>
> *Id.*
> The facts in the instant case are analogous to the ones in *Central Dauphin*, not *BLaST*. Greenfield and Smith engaged in an illegal transaction resulting, regrettably, in the death of Smith. Unlike the situation in *BLaST*, there is no such thing as a "good faith" violation of a criminal law when it comes to heroin. There is no circumstance in which the use or sale of the drug is anything other than a criminal act. To require the Insurance Company to indemnify against damages in a wrongful death and survival action would be to allow the use of a criminal activity as a basis upon which to make money. As we said in *Central Dauphin*, this would contravene public policy.

any ambiguity arising from the use of the term malpractice in the endorsement, as a result of the potentially evil or illegal connotation that might be attributable to that term, is illusory, **since it would be against the public policy of this Commonwealth to permit a carrier to offer insurance for damages assessed as a result of evil or illegal conduct.**

*Id.* at 747 (emphasis added). This Court determined that the insurance company was not required to indemnify the pharmacist, stating that "[w]e believe that it was beyond the contemplation of the parties that the policy would cover a pharmacist who continuously dispenses drugs to an individual without a prescription despite advice to the contrary from the individual's personal physician." *Id.* at 747 n. 3. Given this determination with respect to drugs that could be prescribed legally in the appropriate circumstances, there is no doubt that the Policy in the case *sub judice* is not intended to cover sales of heroin.[15]

Salient facts in *Haver* are sadly analogous to the ones regarding Greenfield and Smith. In that case, the victim who participated in the illegal drug transaction was a substance abuser who had dealt with the pharmacist previously, and her conduct, as well as that of the pharmacist, was illegal. While we do not wish to diminish the pain and horror that result from the death of an eighteen-year-old from heroin, the record reflects that she and Greenfield had a history of trading drugs with each other since 1994 and that she came to the home of Greenfield seeking heroin on the night of her death. Similar to the victim in *Haver*, Smith was a willing participant in a criminal transaction.

 "Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision." *Hall v. Amica Mutual Insurance Company*, 538 Pa. 337, 648

---

15. In *Haver*, I wrote a concurring opinion joined by then Chief Justice Flaherty to express my opinion that "regardless of the averments in the complaint or the language of the policy of insurance, it is against public policy to allow insurance coverage for an illegal drug transaction." *Id.* at 748.

A.2d 755, 760 (1994) (quoting *Mamlin v. Genoe*, 340 Pa. 320, 17 A.2d 407, 409 (1941)). Regardless of whether the insurance contract listed the possession, use and sale of heroin as an exclusion, the fact is that the legislature has criminalized the conduct that resulted in the damages in the instant matter. This exemplifies the clearest of cases.

Moreover, the Insurance Company argued that public policy prohibits indemnification under the Policy, citing, among other statutes, the Controlled Substances Act, which criminalizes the possession, use, or transfer of heroin as a felony violation infringing upon public health, safety, morals, and welfare. Brief of Appellee at 22. This comports with our requirement that

> A Plaintiff must do more than show a possible violation of a statute that implicates only her own personal interest. The Plaintiff in some way must allege that some **public policy** of *this* Commonwealth is implicated, undermined, or violated because of the employer's termination of the employee. **Public policy** of the Commonwealth must be just that, the **policy** of the Commonwealth.

*McLaughlin v. Gastrointestinal Specialists, Inc.*, 561 Pa. 307, 750 A.2d 283, 289 (2000).[16]

Our Commonwealth, from the legislature to the Secretary of Health, has made its policy on the illegality of heroin abundantly clear: "heroin has a high potential for abuse, has no accepted medical use within the United States, and ... is unsafe for use even under medical supervision." *Greenfield*, 805 A.2d at 627.

Given this clear enunciation of public policy regarding Schedule I controlled substances, we find that the Insurance Company is not required to defend or indemnify against damages arising out of its insured's criminal acts where the voluntary participation of the victim in an illegal heroin-transaction caused her death.

**16.** This case involved a challenge to an employer's termination of an at-will employee, rather than a contract. The Plaintiff argued that public policy prohibited her discharge allegedly as a result of her claims of OSHA violations.

## CONCLUSION

The public policy in our Commonwealth, as articulated by the legislature, is clear: possession, sale, and use of heroin are illegal. Public policy does not allow recovery under an insurance contract where a willing and frequent participant in this type of criminalized activity dies as a result. This is true regardless of whether the victim intended to die or whether the criminal intended the death, for we will not countenance the turning of illegal activities regarding Schedule I controlled substances into money-making occasions. Although we reject the reasoning of the Superior Court that extended the doctrine of inferred intent to general liability policies, we affirm the Order of the Superior Court based on its articulation of public policy.

Former Justice LAMB did not participate in the decision of this case.

Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Chief Justice CAPPY files a dissenting opinion in which Justice NIGRO joins.

Justice CASTILLE, concurring.

I concur in the result of the lead opinion, but not in its reasoning. I do not seriously doubt that considerations of public policy would warrant denying coverage here, where liability would be premised upon the putative insured's deliberate criminal conduct in selling heroin.[1] In my view, however, this case is resolvable, and the result is the same, by resort to bedrock principles of contract construction. Specifically, I would find that the deliberate conduct here, which would form the basis for homeowners' insurance liability, did not consti-

---

1. I view the question of public policy exclusion more narrowly than the plurality does. Were I to reach the question, I would be more inclined to what appears to be the narrower view expressed in Mr. Justice Saylor's Concurring Opinion.

tute an "accidental occurrence" which would trigger coverage under the plain language of the policy.[2]

As the lead opinion notes, the homeowners' policy at issue here promises personal liability coverage for, *inter alia*, bodily injuries which are caused by a covered "occurrence." The policy then unambiguously defines an occurrence as "an accident" which results in bodily injury or property damage. The unfortunate teenage victim in this case, Angela Smith, did not trip down the stairs in Michael Greenfield's home, or fall upon a knife, or die in a fire. Rather, Smith and Greenfield engaged in a common, commercial transaction of a criminal nature, which just happened to occur in the home: Greenfield delivered heroin to Smith in exchange for a quantity of marijuana and, possibly, a small amount of cash. Smith then voluntarily injected herself with the heroin, thereby causing her own death from heroin intoxication. Greenfield did not inject Smith with the drug; instead, the basis for his liability was premised upon the simple fact of his delivering the

**2.** The plurality acknowledges this issue of contract interpretation but declines to reach it because appellee does not specifically forward it now, although it did argue the issue below. Plurality slip op. at 11–12 n. 6. The question of whether there was a covered "occurrence" under the policy, however, is appellants' lead argument. Appellants go to some length to argue that the decedent's death was a covered occurrence because it was an "accident." Since the moving party has squarely joined the issue, and appellee prevailed below and therefore is not obliged to forward any claim, I believe this question of contract interpretation has been adequately presented even though appellee has confined itself to defending the more extreme, extra-contractual interpretations accepted by the Superior Court.

Moreover, where possible, I think it better to decide cases upon grounds narrower than "public policy," and I would not permit the litigation decisions of the parties to oblige us to weigh in on avoidable questions of public policy. I liken this restraint to the settled rule which applies when a case presents both constitutional and non-constitutional grounds for decision; in that instance, courts will decide the matter on non-constitutional ground where possible. *E.g. Wertz v. Chapman Township*, 559 Pa. 630, 741 A.2d 1272, 1274 (1999) ("It is axiomatic that if an issue can be resolved on a non-constitutional basis, that is the more jurisprudentially sound path to follow"). I realize that questions of public policy are not necessarily of constitutional dimension; nevertheless, since such questions require the judiciary to look to external, oftentimes subjective, and debatable matters, we better serve to confine ourselves to record-based decision-making, when such is possible.

narcotic to Smith, and her later dying from it while still in Greenfield's home.[3]

Whatever else Greenfield's delivery to Smith may have been, it was not an accident. Smith wanted heroin; Greenfield accommodated and delivered it to her. Smith's decision to inject herself with the heroin, as she had done in the past, likewise was not an "accident" for that act, too, was deliberate and voluntary. Following upon the heels of the intentional and illegal activities of both Greenfield and Smith, the fortuity of the fatal overdose, while tragic, can hardly fall into the category of a covered "accident." As appellants themselves note:

> "Accident" has been defined in the context of insurance contracts as "an event or happening without human agency or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens." *Black's Law Dictionary* (6th ed.1990). "Accident" has also been defined as an "unintended and unforeseen injurious occurrence." *Black's Law Dictionary* (7th ed.1999). The Superior Court has defined an accident as an "untoward or unexpected happening."

Brief of Appellants, 10 (Superior Court citation omitted).

The overdose here plainly resulted from human agency. Moreover, the prospect of heroin intoxication, including death from heroin intoxication, was no less plainly foreseeable. Although the overwhelming majority of heroin users do not die from a single injection of the narcotic, it nevertheless is an inherently dangerous drug and the risk of such a lethal result certainly is foreseeable. *See Commonwealth v. Bowden,* 456 Pa. 278, 309 A.2d 714, 718 (1973) (plurality opinion) ("although we recognize heroin is truly a dangerous drug, we also recognize that the injection of heroin into the body does not generally cause death"). The intravenous self-administration

---

**3.** Appellants also alleged that Greenfield was negligent to the extent that he did not care for Smith later that evening and the next morning, although they do not pursue this point as separate grounds for limited relief. In any event, Greenfield's failure to inquire after Smith's condition or to seek assistance for her may have been indifferent, or even callous, but it was hardly "accidental."

of illegally-purchased heroin (here, packaged in a bag ironically labeled, "Suicide") is a modern form of Russian roulette. Indeed, that is one of the reasons the drug is outlawed and why its use, no less than its distribution, is so heavily punished.[4]

There having been no "accident," there was no covered occurrence. I therefore agree with the plurality's determination to affirm the Superior Court's holding that Minnesota Fire does not have a duty to defend or indemnify Greenfield, albeit I concur only in the result because I arrive at that conclusion as a matter of contract construction, rather than resorting to an external ground for decision, such as public policy.

Justice SAYLOR, concurring.

I join the lead opinion's disposition and the core of its analysis, namely, that on the facts of this particular case, public policy may be invoked to deny a defense and indemnification under a homeowner's insurance policy for liability resulting from the criminal delivery and ingestion of a powerful narcotic substance such as heroin. This conclusion does not, in my view, improperly or unfairly rewrite the policy to correct the absence of an appropriate exclusion, particularly since it cannot be reasonably maintained that the parties to the insurance contract anticipated that the homeowner's involvement in the drug overdose death of another would give rise to a covered risk. *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 178(2)(a) (providing that, in weighing the enforcement of a contractual provision in connection with public policy grounds, the parties' justifiable expectations must be considered). Like the lead, I strongly prefer this

---

4. The General Assembly has classified heroin as a Schedule I controlled substance, which is the most serious of designations, and carries the heaviest of punishments. *See* 35 P.S. § 780–104(1)(ii)(10). A drug falls within this schedule because of its "high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision." Id. § 780–104(1).

rationale to support the result in this case over the attribution of "inferred intent" to Greenfield. Indeed, in effect, the inferred intent approach seems to me merely to represent an unnecessarily indirect and somewhat strained route to the implementation of a judicial, public policy exclusion.

Regarding the contractual coverage aspect of the case, my position most closely aligns with that of the common pleas court and Judge Olszewski of the Superior Court. I believe that these jurists were correct in apprehending that, although Appellee's complaint alleged an intentional act by Greenfield (providing heroin to Smith), in the absence of averments alleging or reasonably implying that Greenfield expected or intended to cause her death, this result should be deemed an accidental occurrence rather than one caused with intention. In my view, this approach best comports with the line of decisions establishing that an insured's acts are to be deemed intentional only when he aims to cause the resultant damage or harm of the same general type, *see United Serv. Auto. Assoc. v. Elitzky*, 358 Pa.Super. 362, 371–73, 517 A.2d 982, 987–88 (1986) (citing *Mohn v. Am. Cas. Co. of Reading*, 458 Pa. 576, 326 A.2d 346 (1974); *Eisenman v. Hornberger*, 438 Pa. 46, 264 A.2d 673 (1970)), and constraining the role of reasonable foreseeability (as opposed to substantial certainty of result) in terms of the accidental versus intentional occurrence assessment. *See id.* at 371–73, 517 A.2d at 987.[1]

Centrally, prevailing Pennsylvania law establishes that "[a]n insured intends an injury if he desired to cause the conse-

---

1. I recognize that *Elitzky* facially concerns only an "expected or intended" exclusion, and not also the occurrence-as-an-accident aspect of an insurance policy. In my view, however, the reasoning of *Elitzky—i.e.,* that the terms "expected" and "intended" are ambiguous and, therefore, must be construed against the insurer, *see Elitzky*, 358 Pa.Super. at 371, 517 A.2d at 987—applies equally to an insurer's undefined use of the terms "accident" and "accidental" in defining occurrence-based coverage. Under prevailing principles, then, I believe that the common pleas court was wholly justified in treating the terms "accident" as subsuming the unintended result of an intentional act, where the result was one that was not substantially likely to occur. *Accord id.* at 374–75, 517 A.2d at 989.

quences of his act or if he acted knowing that such consequences were substantially certain to result." *Id.* at 374–75, 517 A.2d at 989; *accord Aetna Life and Cas. Co. v. Barthelemy,* 33 F.3d 189, 191 (3d Cir.1994). Appellee's concession that "the prospect of a fatal overdose may be statistically remote as a function of the number of regular heroin users on a national basis," Brief of Appellee at 10; *see also Minnesota Fire and Cas. Co. v. Greenfield,* 805 A.2d 622, 631 (Pa.Super.2002) (Olszewski, J., dissenting) (observing that a lower percentage of heroin addicts die from heroin-related causes than smokers who die from tobacco-related causes), thus answers the contractual coverage question under the law as it presently stands.

Finally, I would not undertake to consider altering these fundamental, guiding principles on the strength of the present submissions, which, as the lead opinion notes, are focused on the discrete inferred intent and public policy doctrines as they relate to unique circumstances. *Accord id.* at 630–31 (observing that the charged circumstances presented in this case create the potential for undue distortion of the essential contract analysis).

Chief Justice CAPPY, dissenting.

Because I cannot agree with the majority's decision to rewrite the insurance policy at issue, I must respectfully dissent.

We are not here confronted with the question of whether an insurer may enforce an exclusion which excludes from coverage damages arising out of the sale of heroin or any other illegal drug. Rather, at issue is whether this court may insert, via the invocation of public policy, such an exclusion into an insurance policy. The majority finds that this court may rewrite the contract on the basis that an insured should be precluded from receiving coverage where damages result from the insured's criminal act.

In my opinion, this court should not rewrite the contract for the insurance company. The Minnesota Fire and Casualty Company drafted the insurance policy. It is beyond cavil that it was capable of writing an exclusion which would exempt from coverage damages arising out of the sale of illegal narcotics, and yet it did not do so. Arguably, this was a failing on the part of the insurance company. Yet, is it the role of this court to act as super-scrivener, correcting the apparent errors in business judgment committed by insurers? With all due respect to the majority, I submit that this is not a proper role for this body.

Furthermore, I am concerned about the potential sweeping reach of the majority's decision and have grave concerns about its application to future cases. While the majority purports to limit its public policy exception to situations in which an insured engages in illegal activity regarding Schedule I controlled substances, its underlying rationale for creating that limited exception could easily be extended to create exceptions for other illegal acts. Indeed, the majority suggests in a footnote that this court should not require an insurance company to reimburse a policyholder for damages arising from *any* "conduct ... that our legislature has defined as illegal." Maj. Op. at 352–53 n. 12, 855 A.2d at 866 n. 12. I am uneasy about this court issuing such a broad and amorphous pronouncement.

For the foregoing reasons, I respectfully dissent.

Justice NIGRO joins this dissenting opinion.